# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 28, 2014 Session

## STATE OF TENNESSEE v. JAWAUNE MASSEY

**Appeal from the Criminal Court for Sullivan County**
**Nos. S51,540; S52,127     R. Jerry Beck, Judge**

---

**No. E2013-01047-CCA-R3-CD - Filed July 23, 2014**

---

Jawaune Massey ("the Defendant") was convicted by a jury of one count of first degree premeditated murder and one count of first degree felony murder as to victim Nolan; one count of first degree premeditated murder and one count of first degree felony murder as to victim Alexander; one count of especially aggravated robbery; one count of criminal conspiracy to commit aggravated robbery; one count of criminal conspiracy to possess more than 26 grams of cocaine with the intent to sell or deliver; one count of possessing more than 26 grams of cocaine for resale; and one count of maintaining a dwelling where controlled substances are used or sold. For these crimes, the Defendant was sentenced to serve an effective term of two consecutive life sentences. In these consolidated appeals, the Defendant contends that the evidence was not sufficient to support his convictions. He also contends that the trial court (1) erred in consolidating offenses; (2) should have conducted a hearing to determine if a "stun belt" was a necessary restraint of the Defendant during trial; (3) should have instructed the jury that several witnesses were accomplices as a matter of law; and (4) should not have run his life sentences consecutively. Upon our thorough review of the record and applicable law, we reverse on grounds of insufficient evidence the Defendant's conviction of criminal conspiracy to possess more than 26 grams of cocaine with intent to sell or deliver and his conviction of maintaining a dwelling where controlled substances are used or sold. We affirm the remaining judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part, Reversed in Part**

JEFFREY S. BIVINS, SP. J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

William Louis Ricker and Douglas L. Payne, Greeneville, Tennessee, for the appellant, Jawaune Massey.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Barry P. Staubus, District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On November 18, 2005, at approximately 5:00 p.m., Officer Daniel Horne of the Kingsport Police Department ("KPD") responded to the Solé Candle Shop at 829 Myrtle Street in Kingsport, Sullivan County, Tennessee ("the Shop"). In the back room, he found two men lying face-down and side-by-side in a large pool of blood. Officer Horne checked the men for life signs and discerned a "slight pulse" in one of the men. The other man had no pulse.

Dr. William Frederick McCormick performed an autopsy on one of the victims, identified as Jeffrin Nolan. Nolan had been shot twice in the back of the head, and either wound would have been fatal. Both bullets traveled through and exited Nolan's head. Dr. McCormick described the gunshots as "execution type wounds."

Dr. Teresa Allen Campbell performed an autopsy on the second victim, identified as Terrance Alexander. Alexander had been shot once in the head, and he eventually died from that injury. The bullet entered and exited Alexander's head.

In December 2005, the Defendant was charged with one count of criminal conspiracy to possess more than 26 grams of cocaine with the intent to sell or deliver; one count of possession of over 26 grams of cocaine for resale; and one count of maintaining a dwelling where controlled substances are used or sold. In May 2006, the Defendant was charged with the first degree premeditated murder of Nolan; the first degree felony murder of Nolan; the first degree premeditated murder of Alexander; the first degree felony murder of Alexander; one count of especially aggravated robbery; and one count of criminal conspiracy to commit aggravated robbery. Over the Defendant's objection, the trial court consolidated the offenses alleged in the two presentments for a single jury trial, at which the following proof was adduced:

Ashley Adams testified that she lived with victim Nolan as his girlfriend. The Shop was Nolan's business, which he began in March 2005. Nolan opened the business because he was on probation and needed a "front" to cover his drug-selling business. In addition to selling candles from the Shop, Nolan sold cocaine out of the store. As part of the candle business, he normally kept approximately $132 in the cash register. Beneath the cash

register, Nolan kept his handgun in a drawstring bag in a box. Adams identified a gun as Nolan's, and the gun was admitted into evidence.

Adams testified that, when someone wanted to purchase cocaine from Nolan, the person would call him and tell him what the person wanted. If the person was a male, Nolan would put his gun on. However, if the buyer was female, Nolan did not arm himself. When the buyer arrived, Nolan would go into the back room of the Shop where he kept the cocaine. Nolan then would return to the front room of the Shop and deliver the cocaine to the buyer. Adams stated that, typically, Nolan sold between one and two kilos of cocaine a week out of the Shop. He sold the cocaine in one ounce units, packaged in baggies, for $650 per ounce. Adams occasionally sold cocaine at the Shop, as well. She stated that she bought cocaine from Nolan "just like everyone else."

Adams explained that Nolan did not take the cocaine to the Shop but called her for deliveries. She usually delivered two to four ounces at a time. The cocaine was kept at their house, and she delivered only what he was going to sell that day. Nolan also sold cocaine from outside the Shop.

Adams knew Octavia Brooks because their children played together. She saw Nolan sell Octavia[1] cocaine at the Shop. Nolan would allow Octavia into the back room of the Shop. Because they had a "friendly business relationship," Nolan did not arm himself when Octavia came to the Shop.

Adams also knew a male who went by the name, "Rah." He came into the Shop about fifteen times to buy cocaine from Nolan. Rah knew that Adams worked for Nolan. When Rah came into the store, Nolan armed himself, went into the back room by himself and collected the cocaine, and then delivered the cocaine to Rah in the front room of the Shop.

On November 16, 2005, Adams was in the Shop. A man she knew as Jim Bob came into the store. Rah also came into the Shop accompanied by a man she did not recognize. Rah and his companion did not buy any cocaine.

On November 18, 2005, Adams again was in the Shop at about 3:30 in the afternoon. Nolan was wearing a necklace and a pinky ring. Adams brought four ounces of cocaine with her and also paid Nolan $400. Adams explained that Nolan kept cash from drug sales on his person. Victim Terry Alexander came in and paid Nolan some money he owed. Adams left

---

[1] Octavia Brooks was also known as Octavia Wilson. For ease of reference, we will refer to her by her first name. We intend no disrespect.

3

to pick up her daughter, and she did not return to the Shop before learning that Nolan had been shot and killed.

Adams identified a photograph of Rah, and this photograph was admitted into evidence as Exhibit 49. She also identified a photograph of the man who had been with Rah on November 18, 2005, and this photograph also was admitted as Exhibit 50.[2] She identified a photograph of an open drawer in the back room of the Shop. She explained that Nolan kept the cocaine and scales in that drawer and that it was kept closed.

Adams gave two statements to the police, one on the night of the homicides and one "a little while after."

Octavia Patrice Brooks testified that she also was known as Octavia Wilson. In the summer of 2005, she was living with her "ex-girlfriend" in an apartment complex in Johnson City. There, she met Rita Massey, another tenant. Eventually, she moved in with Rita.[3] Through Rita, she met O'Sheene Massey, Rita's brother. She also met the Defendant, their brother, Leslie Ware, and Brian Beco. After she met these people, they moved to a house on Holly Point in the Piney Flats community ("the House") at O'Sheene's[4] direction. She knew that the Masseys and Ware were from New York. Through them, she met Howard Evans, known as "Poobanger." She began dating Evans.

Octavia met Clyde Green in October 2005, and he moved into the House. She acknowledged that she and others who lived in the House were selling cocaine. O'Sheene was in charge of the cocaine business. O'Sheene set the prices for the cocaine they were selling and determined to whom and where the cocaine would be sold. They used the word "work" as a code word for cocaine.

Nolan was Octavia's source for cocaine. She stated that, at the time, she had known Nolan and had been purchasing cocaine from him for several years. When she wanted to buy cocaine from Nolan, she would call him and arrange a meeting. She was familiar with the Shop. She knew that Nolan kept his cocaine in a safe in the back room of the Shop. Because Nolan trusted her, he allowed her into the back room. Nolan did not allow male customers

---

[2] Other proof established that this photograph depicted Leslie Ware.

[3] Because Rita Massey and the Defendant share the same last name, we will refer to Rita by her first name. We intend no disrespect.

[4] Because O'Sheene Massey and the Defendant share the same last name, we will refer to O'Sheene by his first name. We intend no disrespect.

into the back room.  She also knew that Nolan had a gun, and she had  seen him carrying it in his back pocket.  She identified the gun depicted in the photograph admitted as Exhibit 46 as Nolan's.

Octavia introduced O'Sheene to Nolan at the Shop, and O'Sheene purchased cocaine from Nolan.  Octavia testified that Nolan charged her $375 an ounce for cocaine, a price she described as "[p]retty low."  Nolan typically charged "six something" to others for an ounce of cocaine.  Octavia and O'Sheene made multiple trips to the Shop during which O'Sheene purchased cocaine from Nolan.  Nolan never allowed O'Sheene into the back room during these visits.

In early October 2005, prior to moving into the House, Octavia and Beco were living in a house on Hamilton Street.  At that time, the Defendant was living with his girlfriend in an apartment.  The people living in the Hamilton Street residence were asked to leave by the landlord, and Octavia and Rita located the House.  Octavia and Rita entered into a written lease for the House on October 26, 2005, and they paid the first month's rent and a security deposit.  When they moved into the House, O'Sheene and Thelma Gardner, O'Sheene's girlfriend, took the downstairs room with the fireplace.  Ware and Rita took another downstairs room.  Octavia and Evans took a room upstairs.  Beco took a room upstairs.  Green took a room upstairs.  The Defendant was not living there but visited "[a]lmost every day."

At the House, Octavia heard the Defendant, O'Sheene, and Ware talking about robbing Nolan of his drugs and money.  She also heard O'Sheene call Nolan a "snitch."  Octavia testified that she did not warn Nolan of these plans because she "didn't think it was really going to happen."

On November 18, 2005, while she was at work at a call center, Octavia called Nolan and arranged to buy some cocaine from him.  She planned to go to the Shop after work at about 2:30 p.m.  When she left work, she first went home to the House.  At the House were Rita, Gardner, Beco, and Crystal Arnold, Beco's girlfriend.  The Defendant, O'Sheene, Green, and Ware were not there.  Octavia told Beco that she was going to Kingsport to buy cocaine, and Beco told her that he also needed to buy some.  They decided to go together, and Beco drove them in his Toyota 4Runner.  Arnold also went with them.  When they arrived at the Shop, they saw Gardner's Lincoln.  Octavia had not known that the Lincoln would be there.  In the Lincoln, she saw Green, Ware, O'Sheene, and the Defendant.  They parked behind the Lincoln, and O'Sheene came to their car.  O'Sheene told them "[a]bout robbing" Nolan.  O'Sheene told Octavia to go into the Shop first and that the Defendant and Ware would follow her.  She knew that the Defendant and Ware would be robbing Nolan.  Octavia did as O'Sheene directed because she was scared of him.

5

When Octavia walked into the Shop, she saw Nolan and another man in the front room. Octavia gave Nolan the money for her and Beco's cocaine, and Nolan went into the back room to get the cocaine. While she was waiting, the Defendant and Ware walked into the Shop. Both of them had handguns. The Defendant told the man in the front room, "You know what this is." Either the Defendant or Ware told Octavia to leave the Shop. At this point, Nolan was still in the back room. Octavia left the Shop and returned to the Toyota. On the way, she passed Green as he headed toward the Shop. She heard three gunshots. She got to the Toyota, in which Beco, Arnold, and O'Sheene were sitting. O'Sheene told her to get in the Lincoln.

As Octavia sat in the driver's seat of the Lincoln, she saw Ware, the Defendant, and Green leave the Shop and head toward the Lincoln. She started the car and tried to turn it around. She testified, "I attempted to turn the vehicle around, but I was so nervous, I couldn't. I got it stuck in the fence." Green took over driving, and they all left. Both vehicles returned to the House. As Octavia walked into Ware's bedroom, she saw money and cocaine on the bed. She also saw that Ware and the Defendant had a necklace and a ring that she recognized as belonging to Nolan. She saw the Defendant working on his gun, which had jammed. Ware, O'Sheene, and the Defendant argued about how to divide the money and cocaine.

O'Sheene directed her and Rita to go to a store and get some baggies and other items. While she was out, she began receiving phone calls that caused her to become concerned. She called O'Sheene and relayed to him what she had been told. O'Sheene told her to come back to the House. She and Rita returned to the House, and O'Sheene told Octavia to pack her clothes in preparation for going to New York. She protested, but he insisted. O'Sheene told her to give the clothes she then was wearing to Rita and Gardner. O'Sheene also told the Defendant and Ware to give their clothes to the women.

Octavia and Ware gathered their belongings and placed them in the Toyota. They left with Beco driving and O'Sheene as a passenger. They drove to a bridge, and O'Sheene and Ware got out and threw a gun in the water. They drove to a location on Fairview and "traded out vehicles" with Stasha Saults. Beco, O'Sheene, Octavia, and Ware then drove to Richmond, Virginia, where Octavia and Ware got on a bus and traveled to Queens, New York. Octavia was arrested in New York in November 2006.

Initially, she lied to law enforcement. After she was charged, she gave a full and accurate statement. She later pleaded guilty to numerous offenses related to the instant homicides and drug trafficking.

6

On cross-examination, Octavia denied that she had been romantically involved with Nolan. She stated that the people who paid money toward the rent for the House were O'Sheene, Ware, Beco, and herself. She acknowledged that Evans and Beco were members of the Bloods gang. She had heard that O'Sheene was, as well. She denied that they discussed an alibi during the trip to Virginia. She stated that the Defendant's gun was a .22.

Brian Beco, who was an inmate in the Tennessee Department of Correction at the time of trial, testified that he knew O'Sheene Massey, who went by the nickname, "Rah." He met O'Sheene while they were both in the Washington County Jail. Victim Jeffrin Nolan was also in the jail with him and O'Sheene.

After he was released from jail, Beco again crossed paths with O'Sheene in 2005. Through O'Sheene, he became acquainted with the Defendant. Also through O'Sheene, he became acquainted with Leslie Ware. Beco testified that O'Sheene was living on Hamilton Street in Johnson City with Thelma Gardner, nicknamed "Winnie." The Defendant was living in Johnson City with his girlfriend Miranda. Ware also was living in Johnson City. Also through O'Sheene, Beco met O'Sheene's sister, Rita Massey, Clyde Green, and Octavia Brooks. He stated that all of these people were from New York.

Beco learned that O'Sheene ran an operation that distributed cocaine. Beco began selling cocaine for O'Sheene. They sometimes referred to cocaine as "work."

Beco identified the person depicted in the photograph admitted as Exhibit 49 as O'Sheene. The photograph admitted as Exhibit 50 depicted Leslie Ware. The photograph admitted as Exhibit 65 depicted the Defendant. The photograph admitted as Exhibit 66 depicted Octavia Brooks. The photograph admitted as Exhibit 67 depicted Clyde Green.

Beco became aware that O'Sheene and others were going to move into the House. Beco was invited to join them, and he did so. Beco shared in the expenses. O'Sheene ran his cocaine business out of the House. Rita and Ware stayed in one of the bedrooms. Rita's son stayed in another bedroom. O'Sheene and Gardner stayed in another bedroom. Beco stayed in another bedroom. Green stayed in another bedroom. "Poobanger" and Octavia stayed in another bedroom. Beco did not know Poobanger's identity but stated that he was from New York.

Beco stated that he installed a lock on his bedroom door, and he locked the door every time he left. He explained that the Defendant was at the House "almost all the time" but did not live there. The Defendant lived with Miranda in an apartment.

7

Beco stated that there were guns throughout the House. He added that he "was carrying guns." The Defendant, O'Sheene, and Green also had guns. There were also flak jackets in the house.

Beco testified that he was aware that O'Sheene was getting cocaine from Nolan. O'Sheene got four to five ounces of cocaine from Nolan per week. He stated that Nolan sold cocaine for "6-50 an ounce," "the best prices in town." When O'Sheene bought cocaine from Nolan, he brought it back to the House and O'Sheene and Gardner would "bag it up."

Beco testified that he overheard a conversation between O'Sheene, Ware, and the Defendant in which they discussed robbing and possibly killing Nolan.

Beco stated that he was driving the Toyota 4Runner on November 18, 2005. Riding with him was his girlfriend, Crystal Arnold. He picked up Octavia from the House, and they drove to Kingsport. Following Octavia's directions, Beco pulled up behind the Lincoln, which was Gardner's car. Both vehicles were pointed toward the Shop. In the Lincoln were the Defendant, Green, O'Sheene, and Ware. Ware got out and came over to Beco, asking what they were doing there. Beco told him that they were there to buy some drugs. Ware told Beco, "We about to rob him and stuff."

Beco stated that he did not know that the other men were going to be at the Shop that afternoon. When he saw them, he assumed they were there to buy drugs like he was.

Ware returned to the Lincoln, and O'Sheene came over and got in the back seat of the Toyota. O'Sheene said, "We was going to rob the joint." Beco understood that O'Sheene was referring to the Shop and Nolan. Beco asked O'Sheene to first let him get the drugs he was there to buy. O'Sheene agreed, but before Beco could transact his drug purchase, another car pulled up in front of the Shop and two men got out. Everyone waited while the two men went into the Shop. After one or both men left the Shop, O'Sheene sent Octavia into the Shop to conduct the drug buy. O'Sheene told Octavia that "they" were going to follow her. As Octavia walked toward the Shop, the Defendant and Ware followed her.

Beco saw Octavia go into the Shop. He saw the Defendant and Ware enter the shop after her. Then, Octavia "started coming out real fast, walking down the sidewalk back towards us, tripping over her foot." Octavia told Green, who was in the backseat of the Lincoln, that "it's going down." Green got out of the car and began running toward the Shop. Beco asked Octavia if she had the cocaine and she said, "No, that they wouldn't let her get it." A minute later, Beco heard "a loud pop" and then "two more shots." Beco stated that he was familiar with the sound of gunfire and that the sounds he heard were consistent with gunfire.

8

Octavia got in the driver's seat of the Lincoln, and Beco began turning the Toyota around. Octavia tried to turn the Lincoln around but became "stuck in the middle of the road." As Beco began driving away from the Shop, he looked in his rearview mirror and saw the Defendant, Green, and Ware running from the Shop. Green took over the driver's seat of the Lincoln and drove the car away. Both vehicles got on the interstate and headed back to Piney Flats with the Lincoln in the lead. O'Sheene remained in the Toyota during the flight from the Shop. Arnold also was in the Toyota. The other people were in the Lincoln. While Beco drove, O'Sheene made some phone calls, and Beco heard O'Sheene talking to Ware.

Both vehicles arrived at the House, and everyone went inside. They all gathered in one of the bedrooms, and Rita and Gardner counted the money on the bed. Also on the bed were "dope and Baggies, big chunks of it, about five or six of them." Beco thought that the chunks were ounces. A 9mm Smith & Wesson gun was on the bed with the slide cocked back on it and jammed. Someone said that the gun "was jammed from in the store." Beco testified that the Defendant told him "that he shot one of the guns and it jammed." Another black gun also was on the bed.

Beco was present when the Defendant, O'Sheene, and Ware discussed what had happened during the robbery. Beco testified about the conversation:

> When they went in there, and I guess [Nolan] tried to reach for whatever strap that he had, which they took from him, the gray Glock, and then they put him on the floor. And then the other guy, they put him on the floor, too. He was already in the store area when they drawed [sic] out on – on him already and told him to be quiet. [Nolan] didn't know yet.

Beco explained that when the speakers referred to "the gray Glock," they were referring to the Smith & Wesson 9mm, the gun that belonged to Nolan.

Later, O'Sheene, Green, Ware, and the Defendant had a disagreement about how to divide the cocaine and money taken during the robbery. Beco saw Green and Gardner bagging up the cocaine. Beco explained that Green and Gardner were "[c]hopping [the cocaine] down and putting it in sandwich Baggies." Beco realized that the pieces they were bagging were too big, so he "showed them how to bag up a 20, 50, and $100 piece."

Beco stated that O'Sheene got some phone calls advising him that he was suspected of being involved in the crimes at the Shop. O'Sheene spoke with Octavia, and Octavia told Beco that "they was going to go to New York" and asked Beco to take them. Also, "[e]verybody in the house" began cleaning up and bagging the guns. They burned the

9

Defendant's, Ware's, and Octavia's clothes in the back yard. Beco, Octavia, O'Sheene, Arnold, and Ware got into the Toyota, and they drove to Beco's cousin Loretta's house. On the way, they stopped on a bridge, and Ware threw a gun off the bridge. At Loretta's house, Stasha Saults pulled up in a Chevy Equinox. They switched cars, Saults and Arnold taking the Toyota, and the others getting in the Chevy. Beco drove the Chevy to Richmond, Virginia. From there, Ware and Octavia took a bus to New York. Beco and O'Sheene returned to Johnson City and checked into a hotel. Waiting for them there were Arnold, Saults, and Green.

A couple of days later, Beco returned to the House to change clothes and retrieve a bottle of Hennessey cognac that O'Sheene requested. When Beco initially arrived at the House, the police were not there, but after they arrived, he spoke with them. He told them that he did not live there and did not know who did. When the police asked him about the crimes at the Shop, he told them he did not know anything about it. The police allowed him to leave.

A couple of days later, Beco was in the area around Roan Mountain with Arnold, Saults, and O'Sheene. The police "swarmed" them at Saults' mother's house. He and O'Sheene were arrested. Beco subsequently cooperated with the police and pleaded guilty to numerous drug offenses.

On cross-examination, Beco said that O'Sheene told him that he, O'Sheene, was from New York City. O'Sheene also told Beco that he was a member of the Bloods gang. Green also told Beco that he was a member of the Bloods. According to O'Sheene, O'Sheene was in charge of the House operations.

At the request of defense counsel, Beco read aloud his first statement to the police, and it was admitted into evidence. In this statement, Beco reported his activities on the afternoon of November 18, 2005, but said nothing about the crimes at the Shop. At trial, Beco reiterated that his first statement was a lie.

Beco testified that, after he first spoke with the police, he told O'Sheene, "If you all going to stay, then have your alibi correct. If you're going to go to New York, then you all better leave. Whatever you all going to do. But they asked me – they showed me pictures of you all and they're asking about you all."

Beco reiterated that he had nothing to do with the robbery and killings at the Shop. Asked why he helped some of the perpetrators "escape" to Virginia, he replied,

When you find out that two people did murder and they . . . live in another state, and you're afraid for your life and don't know what they might do, I've been around it all. I've been around different types of guys all my life. I was – I was afraid for my life.

Mainly I was really afraid because of [Arnold]. [Arnold] was crying and stuff, and I was afraid that they'd do something to her from where I love her so much I didn't want nothing [sic] to happen to her, that they might try to do something to me, too, in the process. So it was survival mode at the time so[.]

Crystal Marie Arnold testified that she was eighteen years old in November 2005. At that time, she was dating Beco. Arnold stated that, at the time, she still was living at home but occasionally spent the night with Beco. She spent one night in the House. She identified photographs of O'Sheene, Ware, Green, Octavia, and two other women whose names she did not recall. She testified that all of these people lived at the House. She also identified a photograph of the Defendant and stated that she and Beco had visited the Defendant at the Defendant's apartment. She also had seen the Defendant at the House.

Arnold stated that she was not involved in selling cocaine but knew that Beco was. She was with Beco when he met with O'Sheene at a local Burger King, and she witnessed a drug transaction between them.

When she visited Beco at the House, she stayed in his bedroom, which had a lock on it. She knew that there was cocaine activity in the House. She also knew there were guns in the House.

She was with Beco on November 18, 2005, when Beco drove to the Shop to buy cocaine. Octavia was with them. Once they arrived, she recognized the Lincoln from the House. In the Lincoln were the Defendant, Ware, Green, and O'Sheene. O'Sheene got out of the Lincoln and walked over to the Toyota that Beco was driving. She did not recall what O'Sheene said, but after his conversation, "[t]hey sent Octavia Brooks in as a decoy." Arnold watched as Octavia walked toward the Shop followed by the Defendant and Ware. As Arnold watched, Octavia came back out of the Shop and walked toward them. Octavia told Green, "They have their guns pulled. Go in." Green got out of the Lincoln and went to the Shop. After Arnold heard what she thought was a gunshot, she saw Green exit the Shop, followed by the Defendant and Ware. The three men got in the Lincoln, and Octavia

11

attempted to drive the Lincoln, but she got stuck trying to turn the car around. Green took over the driver's seat of the Lincoln, and both vehicles went to the House. O'Sheene remained in the Toyota during the drive.

Arnold stated that she was scared and began crying. When they arrived at the House, she went upstairs to Beco's bedroom while the others remained downstairs. As she passed Ware's bedroom on the way, she saw cocaine, money, and a gun lying on the bed. Later, she left with Beco, Ware, and Octavia. They drove to Loretta's house so that Arnold could retrieve her car. On the way, they stopped on a bridge crossing a lake, and Ware tossed a gun into the lake. When they got to Loretta's house, Arnold kept the Toyota, and the others took her car. She clarified that the "others" were Beco, Octavia, Ware, and O'Sheene. Before he left, Beco gave some money to Arnold's friend, Saults. Arnold and Saults rented a hotel room with the money.

A couple of days later, Arnold was with Beco, O'Sheene, and Saults in the Roan Mountain community. The police arrived and arrested Beco and O'Sheene. Arnold was questioned but not arrested. She lied to the police during her questioning because she was afraid of being labeled a snitch. She was later charged as an accessory after the fact and subsequently gave a truthful account of what had happened.

On cross-examination, Arnold acknowledged a previous conviction for shoplifting and that she was on probation for that offense in November 2005. She denied that she used cocaine. She knew at the time she was dating Beco that he was a drug dealer. She stated that her car was a Chevy Equinox. She stated that the first time she was in the House was on November 18, 2005, but she had been in the driveway at the House several times. On these occasions, she would wait while Beco went inside to get drugs for deliveries.

Thelma Winnifred Gardner testified that she knew O'Sheene and knew his nickname as Rah. She lived with O'Sheene at the House as his girlfriend. She stated that O'Sheene was in the business of selling crack cocaine. She also knew the Defendant, whom she identified in court. She explained that O'Sheene and the Defendant were brothers. Rita Massey was their sister. Gardner also knew Ware, Octavia, Beco, and Green. All of these individuals sold crack cocaine. She knew the Defendant to live with his girlfriend Miranda in Miranda's apartment.

Living at the House with Gardner and O'Sheene were Ware, Rita, Octavia, Beco, and Green. She and O'Sheene stayed in the bedroom with the fireplace on the downstairs floor. Gardner's daughter also lived with them. The Defendant came to the House "[m]aybe every other day."

12

Gardner stated that cocaine was kept and bagged in the House but was not sold out of the House. There also were guns and ammunition and flak jackets in the House. O'Sheene, Ware, and Beco sold the cocaine. The Defendant was "with them." O'Sheene oversaw the sales.

Gardner owned the Lincoln, but O'Sheene and Octavia also drove it.

Gardner overheard a conversation between O'Sheene, Beco, Green, Ware, and the Defendant in which they discussed Nolan. She knew Nolan as someone who owned a candle shop and sold drugs, but she did not know him personally. During the conversation, the men discussed robbing Nolan. The Defendant advised against wearing masks because people would notice them. Octavia was discussed as being the decoy. The Defendant also said that Nolan "had to die."

On the morning of November 18, 2005, Gardner and O'Sheene ran some errands. They returned to the House and went into the bedroom. She fell asleep and when she awoke, O'Sheene was gone. The Lincoln also was gone. Later, O'Sheene returned with Beco, Arnold, Ware, Octavia, and the Defendant. She testified, "They came in the house with drugs and money." She clarified that the drugs were crack cocaine. She also saw a silver gun with a black holster. She stated that she overheard the Defendant and Ware saying that this gun was Nolan's. The drugs and money were divided among the Defendant, O'Sheene, and Ware. There was an argument over the money: "Who went in the store should have got it, and who didn't go in shouldn't have." She heard the Defendant say that Nolan was dead. Octavia said that another person also had been shot.

Ware told Gardner to burn Octavia's, Ware's, and the Defendant's clothes, and she did so the next morning. She spoke with O'Sheene that morning, and he told her that he was in Virginia. He was there with Beco, Ware, and Octavia, and he told Gardner that Ware and Octavia were leaving on a bus for New York.

Gardner later spoke with the police. Initially, she lied to them. Eventually, she was arrested and charged with drug and other offenses.

Gardner identified the gun depicted in the photograph admitted as Exhibit 48 as Nolan's.

On cross-examination, Gardner reviewed a statement she had made, and it was admitted into evidence. In the statement, she indicated that Octavia had shot Nolan. Gardner reiterated that she lied in the first three statements she gave the police and maintained that she told the truth in her fourth statement.

13

On further questioning, Gardner clarified that she had been told to burn the Defendant's clothes, but she did not burn them because he did not have anything else to wear.

Clyde Green, Jr., testified that he had been living in New York in 2005 where he was on parole for selling cocaine. In October 2005, he traveled to Johnson City, Tennessee, where he met up with Ware, O'Sheene, Rita, the Defendant, and a man named Howard Evans, known as "Banger." He knew these people from New York.

Green began living with O'Sheene and Gardner on Hamilton Street in Johnson City. The Defendant was staying with his girlfriend in an apartment. Later, Green and the others moved into the House. Initially, he stayed in the living room. Later, he moved into a bedroom that had been the Defendant's. The Defendant continued to come by the House on a daily basis.

They ran a cocaine business out of the House, and the business was headed up by O'Sheene. One of O'Sheene's rules was that all the residents had to buy their drugs from him. Another rule was that no cocaine was to be sold from the House. Eventually, Green began selling cocaine that he purchased from O'Sheene.

Green knew Nolan to be the source of O'Sheene's cocaine. He was introduced to Nolan by O'Sheene, Ware, and Octavia as "Rah's man." During this meeting, the men stayed in the front room of the Shop, and O'Sheene gave Nolan money. Nolan went to the back room while they remained in the front room. Nolan came back out after about five minutes and gave crack cocaine to O'Sheene. Green saw that Nolan was wearing a handgun on his person. While they were there, Octavia bought a candle. They left the Shop and returned to the House. O'Sheene told Green that Nolan's cocaine price was "cheap" and that it was "the best that's in Kingsport."

Later, Green heard discussions at the House about robbing Nolan. He stated that Ware, the Defendant, and O'Sheene were involved in these discussions. He heard the men describing Nolan as a snitch.

A couple of days before November 18, 2005, Green drove Ware, O'Sheene, and the Defendant to the Shop to buy cocaine. The other men discussed wanting to rob Nolan. When they arrived at the Shop, O'Sheene went in to buy the drugs. When O'Sheene came back out of the Shop, he was talking with "Jim Bob." O'Sheene said that Jim Bob told him there "wasn't nothing there" at the Shop to steal. The men left and returned to the House.

14

On November 18, 2005, O'Sheene asked Green to drive to Kingsport, asking him if he was "ready to get money?" Green assumed that O'Sheene was referring to selling drugs because he was not aware of any plan to rob Nolan on that day. Green drove the Lincoln, and O'Sheene and Ware rode with him. They first drove to an apartment complex and picked up the Defendant. Green then drove to the Shop. During the drive, O'Sheene tried to phone Nolan but did not get an answer. Green also heard O'Sheene get a phone call, and he heard O'Sheene tell the caller that he was going to buy drugs from Nolan.

Green parked the car on the street near the Shop with the car pointed in the direction of the Shop. A Toyota arrived, and he saw Arnold, Beco, and Octavia inside. Beco parked the Toyota behind the Lincoln facing in the same direction. O'Sheene called Beco, and Green heard O'Sheene tell Beco that they were about to rob Nolan. O'Sheene said that they were going to send Octavia in as a decoy. Ware got out of the Lincoln and spent about two minutes at the Toyota. Ware returned and got in the back seat of the Lincoln. In the meantime, Green saw another car pull up in front of the Shop. Someone got out, went in the Shop, came back out, and left in the car. Two seconds later, Octavia got out of the Toyota and began walking to the Shop. Ware and the Defendant followed "right behind her." Green watched all three of them walk into the Shop.

Green stated that, during this time, O'Sheene was in the Lincoln with him. O'Sheene told Green to go into the Shop and tell the others to "hurry up." As Green walked toward the Shop, he saw Octavia leaving the Shop. When he walked into the Shop, no one was in the front room. As he walked toward the back room, he saw the Defendant holding the door open and holding two guns. One of the guns was Nolan's and the other gun was the Defendant's. Green also saw Ware standing over Nolan. Another person he did not recognize was lying on the floor next to Nolan. Ware also had a handgun, and it was pointed at Nolan's head. Ware said, "Where's everything at? Where the rest of it's [sic] at?" Nolan told Ware "[t]hat he have [sic] everything. That he don't got nothing [sic] else there."

Green decided to leave. As he turned to walk away, he saw Ware shoot one time at Nolan with the gun pointed at Nolan's head. As Green left the Shop, he heard two more shots. He did not see who fired the latter two shots. Ware returned to the Lincoln. Behind Green was the Defendant. Behind the Defendant was Ware. Green replaced Octavia in the Lincoln's driver's seat, and Ware, the Defendant, and Octavia got in the Lincoln. O'Sheene was in the Toyota. Both vehicles returned to the House. There, Arnold went to Beco's bedroom. The rest of them gathered in another bedroom, and Green saw "[g]uns, drugs, and money" on the bed. He clarified that the drugs were crack cocaine. The guns included Nolan's. The Defendant, Ware, and O'Sheene were arguing about how to split the money. Ware and the Defendant were arguing that, since O'Sheene did not "do anything," he should not get any of the money. Nolan's gun was put in the clothes dryer, and Green identified a

15

photograph showing Nolan's gun in the dryer. O'Sheene told Green to bag up the cocaine. Beco and Gardner assisted him.

Green stated that he did not get any of the money or cocaine taken in the robbery.

After they got back to the House, O'Sheene received several phone calls. After getting these calls, O'Sheene stated that "everybody knowed [sic] what happened, and people should start going to New York." O'Sheene told Octavia to take her clothes off and told her that she was going to New York with Ware. Most of the people left the House, and Green walked down to the Burger King "to get a ride to go to Johnson City." After Green was in Johnson City, O'Sheene called him and told him to get a hotel room for O'Sheene and Beco, who were on their way back from Virginia.

Two to three weeks later, Green was arrested in Johnson City for violating his New York parole. He did not tell the police about what he knew because he was scared. Although he initially lied to the police, he eventually gave them a full statement.

On cross-examination, Green acknowledged that, during his guilty pleas to charges arising out of this matter, he agreed that the State's recitation of the factual basis for the pleas was correct. That recitation included the following: "While he did not have extensive conversations with the rest of the co-conspirators, O'Sheene Massey did tell him subsequent to the murders that Massey would be putting the blame for the murders on somebody else, and that if Clyde Green would help him in his effort, he would help Clyde Green." When asked if O'Sheene put the blame on someone else, Green responded, "Yes." Green also stated that O'Sheene, Evans, and Beco were members of the Bloods gang. Green denied that he was a member of a gang. He heard that Nolan was a member of the Crips, a rival gang.

Green stated that he and O'Sheene occupied the same cell block for about a year beginning in the summer of 2006.

Casey Chambers testified that, in November 2005, she lived on Myrtle Street with her ex-boyfriend. She was familiar with the Shop and knew Nolan by sight. She never went in the Shop because she had heard that Nolan "sold drugs out of it."

On November 18, 2005, she was home and helping her boyfriend work on a car. She saw an "older grayish car" pull up in front of the house, and she identified a photograph of the Lincoln as the car she saw. She also noticed a black Toyota 4Runner pull up behind the Lincoln. In the Toyota, she saw a black male in the driver's seat and a "mixed female" in the front passenger seat. She saw four black males in the Lincoln. She made eye contact with the person in the front passenger seat of the Lincoln and identified him as the person depicted

16

in the photograph admitted as Exhibit 49.[5] She also saw a person get out of the Lincoln from the rear passenger seat. She identified him as the person depicted in the photograph admitted as Exhibit 50.[6] This person went to the passenger side of the Toyota. After less than a minute, he got into the Toyota, remained for a few minutes, and then returned to the Lincoln. He leaned in the Lincoln and then returned to the Toyota. Later, she saw this person walk in the direction of the Shop. Accompanying him was "the guy that was in the back seat on the driver's side of the [Lincoln]." When the men got out of sight, she quit watching the scene.

When she heard her dogs barking, she returned to watching the scene. She saw a black female coming towards the Lincoln from the direction of the Shop. The woman was waving her hands, making a commotion, and telling "them" to come on. Chambers did not recognize the woman. She saw the driver of the Lincoln get out and pass the woman. The woman got in the Lincoln.

A few minutes later, Chambers again heard her dogs barking. She came back to the front of the house and saw three black males running down the street toward the Lincoln. These men were coming from the direction of the Shop. She recognized these men as the driver and two backseat passengers of the Lincoln. The men got into the Lincoln, which the woman was now driving. The original driver replaced the woman and the car left, spinning its tires. She stated that the Toyota was already gone, but she did not see it leave.

At the police station later, Chambers identified a photograph of O'Sheene and a photograph of the woman. The photograph of the woman was admitted as Exhibit 66.[7] Shown a photograph admitted as Exhibit 67, she identified the male driver of the Lincoln.[8] She identified the person depicted in the photograph admitted as Exhibit 65 as the man that had been in the back seat of the Lincoln on the driver's side and one of the men she saw going both to and from the Shop.[9] The person depicted in Exhibit 50 (Ware) was the person who had gone back and forth between the Lincoln and the Toyota.

_____

[5] Adams testified that this person was O'Sheene.

[6] Other testimony identified this person as Leslie Ware.

[7] Beco testified that this photograph depicted Octavia.

[8] Beco testified that this photograph depicted Clyde Green.

[9] Beco testified that this photograph depicted the Defendant.

On cross-examination, Chambers denied that she knew the name of the person depicted in Exhibit 65 and stated that she did not know him personally.

Detective David Joe Cole of the KPD responded to the Shop. He collected evidence, including a lavender scented candle, $174.36 in cash from the cash register, a box containing an empty brown felt bag that was located beneath the cash register, a set of U.S. Balance electronic scales, a cell phone belonging to Nolan, a "spent bullet found in a pool of blood near [victim Alexander]," a 9mm shell casing, another shell casing, a small plastic bag containing what appeared to be cocaine found in victim Alexander's clothing, and another spent bullet. He found no money or gun on Nolan's person.

Several days later, Detective Cole reported to the House to assist in the execution of a search warrant. There, he found a burn pile in the back yard, and he collected the ashes. The pile contained some buttons and some fabric.

Captain Jason Bellamy of the KPD, who was a detective in November 2005, described the area in which the House was located as an "[a]verage type subdivision." When Captain Bellamy initially arrived at the House, the only person there was Brian Beco, and he denied living there. Captain Bellamy saw a gray Lincoln automobile and a black Toyota 4Runner at the House. Inside the House, it appeared as though several people lived there. A number of weapons were lying out in the open. A few days after the residence was searched, a neighbor alerted the police that several people had returned to the House and were "loading stuff into a vehicle." Capt. Bellamy returned to the House and apprehended Rita Massey and Thelma Gardner.

Capt. Bellamy also returned to the Shop several days after the killings and located a third bullet on the floor. He was unable to find a third shell casing. Capt. Bellamy also tried to find a gun at a lakeshore, but he did not locate the gun.

During Capt. Bellamy's testimony, the parties entered the following stipulation into evidence: "Comfort Suites of Johnson City provided hotel records of Crystal Arnold, Brian Beco, Clyde Green, and Stasha (Erin) Saults for the period of time around November 18, 2005 to Detective Jason Bellamy of the Kingsport Police Department upon receipt of his written request in the murder investigation concerning the Sole Candle Shop."

Capt. Bellamy identified the person depicted in the photograph admitted as Exhibit 49 as O'Sheene Massey, also known as Rah. The photograph admitted as Exhibit 50 depicted Leslie Ware.

18

David Quillen, previously a corporal with the KPD, was initially the lead detective in the homicide investigation. He left the KPD about six weeks later. He was present during the initial visit to the House on November 20, 2005. While there, he and the other officers found a Ford Crown Victoria in the vicinity, in addition to the Lincoln and the Toyota. They impounded and searched all three vehicles. In the Toyota, Quillen found some papers in the name of Brian Beco and, in a matchbox, a razorblade that had some white residue on it. He explained that the razorblade was consistent with drug activities.

Officer Bryan Bishop of the KPD was working with the Second Judicial Drug Task Force in November 2005. He assisted in the search of the House where he found a gun bag containing an AK47-style rifle, a "scoped" .22 rifle, two semi-automatic pistols, two magazines for use in the AK47, and another .22 rifle with the barrel and stock shortened. In a second gun bag he found a 12-gauge shotgun, an AK47-style rifle, two revolvers, an SKS-style rifle, and a "large frame pistol." In the clothes dryer, he found a pistol in a nylon holster.[10] Also in the House, he found two flak jackets, one of which contained a checkbook in the name of Rita Massey. A bag found at the House contained a handgun permit application for Rita Massey. A rental agreement for premises at 213 Hamilton Street was found, containing the signatures of Octavia Brooks and Rita Massey. A lease agreement for the House dated October 27, 2005, also was found, signed by Rita Massey and Octavia Wilson as the tenants. A receipt dated October 26, 2005, in the amount of $1,650 was found, designated as "for security deposit and rent." The receipt reflected that the funds had been received from Octavia Wilson and Rita Massey.

In a chest of drawers in one of the bedrooms, Officer Bishop found a Bersa .380 pistol. Also in the chest of drawers, he found a plastic bag containing "a small amount of an off-white substance, hard substance." Officer Bishop described the packaging of this substance as consistent with that used for cocaine.

In one of the beds, Officer Bishop found a bag containing boxes of different caliber bullets and a pistol. Under the bed's mattress, he found $2,028 in cash. On the television set at the foot of the bed, he found "a set of digital scales with white power residue on them." Under the bed was a single-shot shotgun. Under the bottom cover of the playpen located in the same room, he found a bag containing "various size pieces of that same off-white colored substance." This bag contained several smaller bags of individual pieces of the substance. Also in the playpen was a prescription bottle in the name of O'Sheene Massey.

In a couch located in a different room, Officer Bishop found a loaded magazine for a weapon. In yet another room, he found another flak jacket, a bag of various pistol bullets,

---

[10] Other testimony established that this was Nolan's gun.

19

and documents in the name of Brian Beco. The door of this particular room contained a deadbolt lock, which none of the remaining interior doors had. Also in the room was a candle labeled "lavender." Another bedroom contained documents in the name of Clyde Green. One of the documents indicated a transfer of $60 to Sheena Robertson in New York. Officer Bishop also found bullets in this bedroom.

Officer Bishop testified that, in 2005, an ounce of cocaine would sell for approximately $1,400 on the street. One-half of a gram of cocaine would sell for approximately $100 on the street. Because an ounce contained 28 grams, the street price of an ounce of cocaine divided into one-half gram amounts was $5,600. A kilogram of cocaine contained thirty-six ounces. Officer Bishop considered someone who sold between one and two kilograms of cocaine divided into one-ounce amounts in Kingsport, Tennessee, to be "a large dealer on a wholesale level."

Officer Bishop stated that he did not find any objects in the House that could be used as pipes for smoking crack cocaine. He acknowledged that such tools might be kept on the smoker's person.

Special Agent Steve Scott of the Tennessee Bureau of Investigation ("TBI") crime lab firearms identification unit testified that he examined the Smith & Wesson 9mm handgun admitted as Exhibit 44 and identified as Nolan's gun; the Lorcin 9mm handgun admitted as Exhibit 150; and the 9mm rifle admitted as Exhibit 148. He also examined two cartridge cases and three bullets collected in conjunction with the investigation. He testified that the two cartridge cases recovered from the Shop were both fired from the same gun but were not fired from any of the aforementioned guns. The bullets were in such a condition that he could not match them to any particular weapon. He opined that the bullets were 9mm.

Special Agent Scott also examined a handgun collected at the House and admitted as Exhibit 149, a "High Standard Crusader Model 1911" that was a ".38 Super caliber." He stated that the ammunition fired from this gun was "very similar" to the ammunition fired from 9mm guns. He test-fired the Crusader with both .38 Super caliber cartridges and 9mm cartridges, and the handgun operated properly with both sets of ammunition. He testified that the two cartridge cases recovered from the Shop were not fired from the Crusader.

Special Agent Scott explained that there were a couple of ways that a firearm can jam:

Either as the ammunition is being moved from the magazine into the chamber, it can get caught on a – on an edge, or it can be the improper ammunition and it can cause the firearm to jam.

20

There are times when, in the extraction and ejection process, that as the slide moves to the rear it may not move quite far enough or may move too slowly, and that cartridge case gets stuck in the action. We call that a stovepipe.

And in some instances the gun can stovepipe with that cartridge case somewhat stuck straight up and a second cartridge attempting to go into the chamber's like a double feed.

None of the guns he tested jammed during his testing.

Special Agent Hunter Green of the TBI crime lab latent print unit testified that she examined several objects collected from the House for latent fingerprints. She found prints matching Gardner's and Green's on two plates.

Special Agent Glen J. Glenn of the TBI crime lab drug section testified that the plastic bag recovered from the House and admitted as Exhibit 153 contained .1 grams of cocaine base. The plastic bag collected at the House and admitted as Exhibit 155 contained .2 grams of cocaine base. The "residue" contained in the scales collected at the House and admitted as Exhibit 157 was cocaine base. Residue collected from a razorblade and two plates recovered from the House and admitted as Exhibit 159 was cocaine. Thirteen bags recovered from the House and admitted as Exhibit 162 each contained cocaine, totaling 45.08 grams.

Brian Pritchard, special agent with the TBI, reported to the Shop on the evening of the homicides. He was given victim Nolan's telephone to investigate. The phone reflected data related to "Rah." As a result, Agent Pritchard obtained a subpoena for the records relating to the phone number attributed to Rah. The parties entered the following stipulation:

On November 23, 2005, Agent Brian Pritchard of the Tennessee Bureau of Investigation served a subpoena on Sprint Corporate Security for the subscriber information for telephone number 423-946-9322 as well as the call history for this phone between the dates of November 18, 2005 and November 23, 2005. In compliance with the subpoena, Sprint Corporate Security provided the requested records as well as the subscriber information which showed Thelma Gardner as the subscriber and her address being 1007 Oak Street, Johnson City, Tennessee, 37601.

Agent Pritchard identified the documents he received from Sprint in response to the subpoena, and they were admitted into evidence. The documents indicated that the phone associated with Rah made three short calls to the phone associated with Nolan during the

afternoon of November 18, 2005. Agent Pritchard learned that "Rah" was O'Sheene. Agent Pritchard continued to monitor the phone calls made from O'Sheene's phone, and this information assisted in locating O'Sheene for arrest. Beco was taken into custody with O'Sheene. Agent Pritchard also assisted in trying to locate the gun reportedly thrown from a bridge but the search was unsuccessful. Agent Pritchard also assisted in trying to locate the Defendant for arrest. The parties entered the following stipulation:

> [T]hat [the Defendant] was arrested in Baltimore, Maryland on September 17, 2009 on an outstanding warrant from Sullivan County, Tennessee on the charges that are indicted in these cases and he waived extradition to Sullivan County, Tennessee for prosecution.

The defense called Michael Roeske, Senior Captain Paramedic with the Kingsport Fire Department. He responded to the Shop after the shootings. He and the other five firemen who responded with him determined that one of the victims was deceased. The other victim was still breathing. Roeske thought he saw three shell casings near the victims as well as a 9mm slug.

Sally Delores Johnson of Baltimore, Maryland, testified that the Defendant is the father of her daughter Celena's five children. One of the children was born on November 28, 2004. Johnson testified that the Defendant was present during this child's first birthday on November 28, 2005. On the Saturday before Thanksgiving in 2005, the Defendant helped her clean her church.[11] At that time, Johnson testified, the Defendant had long hair. His hairstyle remained the same into 2009. The Defendant lived with her daughter and took care of the children.

On cross-examination, Johnson stated that she did not know that the Defendant had a brother who lived in Tennessee. She knew he had a sister but did not know she lived in Tennessee. She acknowledged that she had not seen the Defendant on Friday, November 18, 2005.

Kelly Evans of Baltimore, Maryland, testified that she and the Defendant have a son together. She saw the Defendant after Thanksgiving of 2005 in Baltimore, and she stated that he acted the same as he had acted before the holiday. She knew him to be living in Baltimore and had no knowledge that he was "hiding" there.

---

[11] We take judicial notice that the Saturday before Thanksgiving in 2005 was November 19.

On cross-examination, Kelly[12] explained that she knew the Defendant resided with Celena Johnson, with whom he had five children. Kelly lived about five miles away from the Defendant's residence.

The State called Miranda Stanley in rebuttal. She met the Defendant in early 2005. The Defendant moved into her apartment in March or April of 2005 as her boyfriend. They had a child together. She lived with the Defendant until October 2005. During this time, the Defendant was unemployed and did not have a vehicle. She worked Monday through Saturday from 8:30 a.m. to 4:00 p.m. She met O'Sheene through the Defendant. She also met Ware, Octavia, Rita, and Gardner through the Defendant. The Defendant never told her about Celena or Kelly, although he did tell her that he had children.

Stanley knew that the Defendant had a gun, "but it was messed up, it didn't work or there was something wrong with it." She had no knowledge about the House.

In mid-October 2005, she moved out of the apartment they shared because of problems between her and the Defendant. She never saw or heard from the Defendant after Thanksgiving 2005.

On cross-examination, Stanley admitted that she was addicted to crack cocaine and was using it on a daily basis in 2005. She also was smoking marijuana every day.

Trooper Joshua Hooper of the Maryland State Police testified that he interviewed Sally Johnson on June 6, 2011. She told him that the Defendant had a brother in Tennessee, but she did not know his name. She also said that the Defendant "had expressed interest to visit the brother, but it was [her] understanding that the brother didn't want [the Defendant] there, or [the Defendant] to come and visit."

Based on this proof, the jury convicted the Defendant of the first degree premeditated murder of Nolan; the first degree felony murder of Nolan; the first degree premeditated murder of Alexander; the first degree felony murder of Alexander; one count of especially aggravated robbery; one count of criminal conspiracy to commit aggravated robbery; one count of criminal conspiracy to possess more than 26 grams of cocaine with the intent to sell or deliver; one count of possessing over 26 grams of cocaine for resale; and one count of maintaining a dwelling where controlled substances are used or sold. The trial court sentenced the Defendant to life imprisonment with the possibility of parole on both of the first degree premeditated murder convictions. After a sentencing hearing, the trial court

---

[12] Because this witness has the same last name as Harold Evans ("Poobanger"), we refer to her by her first name. We intend no disrespect.

merged the dual first degree murder convictions as to victim Nolan, merged the dual first degree murder convictions as to victim Alexander, and ordered the sentences for those crimes to run consecutively. The trial court sentenced the Defendant as a Range I offender to sixteen years for the especially aggravated robbery conviction; to six years for the conspiracy to commit aggravated robbery conviction; to ten years for the conspiracy to possess over 26 grams of cocaine for sale or delivery conviction; to ten years for possession of over 26 grams of cocaine for sale or delivery conviction; and to three years for the maintaining a dwelling where controlled substances are sold or used conviction. The trial court ordered the Defendant to serve these sentences concurrently with the life sentences, for an effective sentence of two consecutive terms of life imprisonment.

The Defendant timely filed a motion for new trial which the trial court denied. In this appeal, the Defendant contends that the evidence was not sufficient to support his convictions. He also contends that the trial court (1) erred in consolidating the offenses charged in the two presentments; (2) should have conducted a hearing to determine if a "stun belt" was a necessary restraint of the Defendant during trial; (3) should have instructed the jury that several witnesses were accomplices as a matter of law; and (4) should not have run his life sentences consecutively. We will address each of these issues in turn.

## Analysis

### *Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our

24

Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

Given the volume of testimony adduced in the Defendant's trial, we deem it helpful to summarize the proof in the light most favorable to the State. Nolan sold cocaine out of the Shop. He kept only as much cocaine on the premises as he anticipated selling on a given day. The Shop contained two rooms, and Nolan kept the cocaine in the back room. In the front room, he kept a handgun in a box under the cash register. When making cocaine sales to male customers, Nolan carried the gun on his person. Nolan would go into the back room to retrieve the cocaine, leaving his customer in the front room. Nolan delivered the cocaine in the front room and kept the purchase money on his person. Nolan was known to have the best cocaine prices in town.

Nolan developed a business relationship with Octavia and made an exception to his usual business practices when selling cocaine to her by allowing her into the back room. That is, Nolan had developed a level of trust with Octavia. When Octavia introduced Nolan to O'Sheene, Nolan became O'Sheene's cocaine supplier. Nolan charged O'Sheene a higher price for cocaine than he charged Octavia.

O'Sheene developed a cocaine-selling business that he operated out of the House. Living with him in the House, and working in the business, were Gardner, Ware, Rita, Beco, Green, Octavia, and Evans. They kept and bagged cocaine in the House but did not sell the cocaine at the House. They kept multiple guns and flak jackets in the House. Rent for the House was paid by the persons living there. The Defendant, O'Sheene's brother, visited the House on a regular basis while living with his girlfriend Miranda in Miranda's apartment. O'Sheene, Ware, and Beco sold the cocaine, and the Defendant was "with them." The Defendant owned a gun that malfunctioned.

O'Sheene, Ware, and the Defendant discussed robbing Nolan. The Defendant insisted that they would have to kill Nolan and that they should not wear masks in order to avoid attracting attention.

25

At about 3:30 p.m. on November 18, 2005, Nolan's girlfriend, Ashley Adams, delivered four ounces of cocaine to Nolan at the Shop. She also paid Nolan $400.[13] While she was there, Terry Alexander came into the Shop to pay Nolan some money that Alexander owed. While Alexander was still there, Adams left the Shop.

At about the same time, Beco drove to the Shop in his Toyota, accompanied by Arnold and Octavia. Beco and Octavia intended to purchase cocaine from Nolan. When they arrived, they saw Gardner's Lincoln parked a short distance from the Shop. In the Lincoln were O'Sheene, Green, Ware, and the Defendant. Beco pulled in behind the Lincoln and O'Sheene and Ware got out and told Beco that they were planning to rob the Shop. Beco explained that he just wanted to buy some cocaine. O'Sheene decided to send Octavia into the Shop as a decoy. Octavia walked to the Shop followed by the Defendant and Ware.

When Octavia arrived in the Shop, she saw Nolan and another man in the front room. She gave Nolan money to buy cocaine for her and Beco. Nolan went into the back room to get the cocaine. While she remained in the front room, Ware and the Defendant entered the Shop. Both the Defendant and Ware had handguns. The Defendant told the man waiting in the front room, "You know what this is." While Nolan was still in the back room, Octavia left the Shop without having completed her cocaine purchase. She returned to the vehicles.

O'Sheene ordered Green to go the Shop and tell the other men to hurry. Green walked into the Shop and saw Ware and the Defendant. The Defendant had two guns, his and Nolan's. Ware was pointing his gun at the prone Nolan. There was another man lying next to Nolan. Ware was demanding "the rest" of Nolan's possessions. Green saw Ware shoot his gun once at Nolan's head. As Green left, he heard two more gunshots but did not see who shot them.

The three men returned to the Lincoln. By this time, O'Sheene had gotten into the Toyota, and Octavia was driving the Lincoln, trying to turn it around. Green replaced her as the driver, and both vehicles left the scene. Everyone drove to the House. Once there, Ware and the Defendant produced the items they had taken from Nolan: cash, cocaine, and Nolan's gun and jewelry. An argument developed over how the drugs and money should be divided. The Defendant had Nolan's gun with him, and someone hid it in the dryer. The Defendant struggled with his own gun, which had become jammed. Beco, Green, and Gardner began bagging up the cocaine for resale.

---

[13] Although the record does not reveal the precise reason that Adams paid Nolan this money, she testified that she purchased cocaine from him.

O'Sheene became concerned that they had been identified as the perpetrators. He ordered Gardner to burn the clothes that Ware, the Defendant, and Octavia had been wearing while they were in the Shop. Gardner burned Ware's and Octavia's clothing but not the Defendant's because he did not have any other clothes to wear. At O'Sheene's direction, Beco drove O'Sheene, Ware, and Octavia to Richmond, Virginia, where Ware and Octavia boarded a bus to New York. On the way, Beco stopped the car on a bridge over a body of water, and Ware dropped a gun into the water. The Defendant fled to Baltimore.

Beco and O'Sheene returned to Tennessee, and they were apprehended a few days later in the Roan Mountain area. In the meantime, law enforcement officers had collected three bullets and two cartridge casings from the Shop. Law enforcement officers searched the House and found multiple guns, including Nolan's, multiple rounds and types of ammunition, flak jackets, paperwork in the names of some of the residents, cash, and over forty-five grams of cocaine. Later testing indicated that the three bullets recovered from the Shop were 9mm. Law enforcement agents tested the 9mm guns collected from the House and determined that none of those guns fired the casings found at the Shop. Law enforcement officers did not find the gun reportedly dropped into the water. Nolan and Alexander each died from execution-style gunshot wounds to the head. Nolan had been shot twice and Alexander had been shot once.

We turn now to a determination of whether this evidence was sufficient to support each of the Defendant's convictions.

### First Degree Premeditated Murder

Our criminal code defines first degree premeditated murder as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Furthermore,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Our supreme court has recognized that "[p]remeditation may be inferred from the manner and circumstances of the killing." Finch v. State, 226 S.W.3d 307, 318 (Tenn. 2007)

27

(citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "Circumstances which will support a finding of premeditation include the accused's threats or declarations of an intent to kill; the procurement of a weapon; lack of provocation by the victim; . . . the infliction of multiple wounds; failure to aid or assist the victim; . . . and the destruction or secretion of evidence of the killing." State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009) (citing State v. Banks, 271 S.W.3d 90, 139 (Tenn. 2008); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); Bland, 958 S.W.2d at 660)). Proof that the accused had a motive to kill the victim and the accused's use of a deadly weapon on an unarmed victim are also circumstances that permit the inference of premeditation. Leach, 148 S.W.3d at 53-54 (citations omitted).

Additionally, although not necessarily indicative of premeditation, "flight and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt." State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985); see also Dorantes, 331 S.W.3d at 388. Finally, an accused may be held criminally responsible for the first degree murder committed by another if the accused, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2003).

In this case, the proof at trial permitted the jury to find that both victims had been shot execution style and that the victims were unarmed at the time they were shot. A total of three shots were fired. The Defendant had been overheard discussing the robbery of Nolan and stating that Nolan "had to die." Green testified that he saw the Defendant in the Shop armed with two guns, one of which was Nolan's, while Ware stood over Nolan and demanded, "Where's the rest of it's [sic] at?" Green saw Ware shoot Nolan, and, as he left, Green heard two more gunshots. One of these shots hit Nolan a second time, and the other shot struck Alexander. After the murders, the Defendant was heard arguing about how the proceeds from the robbery should be divided among the participants, including himself.

After the murders, Ware fled to Virginia. On the way, Ware disposed of a firearm in a body of water. This gun was never recovered. The Defendant took Nolan's gun to the House. There, it was hidden in a clothes dryer where it was later recovered by law enforcement officers. None of the guns recovered at the House that were capable of firing 9mm bullets, including Nolan's, fired either of the two shell casings recovered from the Shop. Octavia testified that, after the homicides, she saw the Defendant working on his gun, which had jammed. The Defendant told Beco that the gun he fired had jammed. Stanley testified that the Defendant's gun had "something wrong with it." Special Agent Scott testified that, when a gun jams, it may retain the cartridge casing. This proof permitted the inference that Ware disposed of the gun that fired the two cartridges whose casings were

recovered from the Shop and that the Defendant's gun fired the other cartridge and then jammed, retaining the casing. Like Ware, the Defendant fled Tennessee after the crimes, and he was seen in Baltimore, Maryland, the next day.

This proof was sufficient to establish that the Defendant actively participated with Ware in committing the first degree premeditated murders of Nolan and Alexander. However, the Defendant's convictions of the premeditated murders of Nolan and Alexander cannot rest solely upon the uncorroborated testimony of his accomplices. See State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn.1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). Rather,

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Bigbee, 885 S.W.2d at 803 (citations omitted). It is for the jury to determine whether sufficient corroboration exists. Id.

We hold that there was sufficient corroborating evidence to establish the Defendant's guilt of the premeditated murders of Nolan and Alexander. Casey identified a photograph depicting the Defendant as one of the men she saw walking toward the Shop on November 18, 2005, and whom she later saw returning from the Shop.[14] Stanley testified that the Defendant had a gun that "was messed up, it didn't work or there was something wrong with it." Law enforcement officers recovered three bullets from the Shop but only two cartridge casings. Special Agent Scott explained that a firearm can malfunction by retaining a cartridge case after firing the bullet. This permitted the inference that the Defendant's gun fired the third bullet. Johnson testified that she saw the Defendant in Baltimore, Maryland,

---

[14] Although Beco identified this photograph as depicting the Defendant, the jury was able to determine for itself whether the photograph was of the Defendant.

on November 19, 2005, the day after the homicides. All of this proof was adduced through sources other than accomplices and permitted the inference that the Defendant participated in the murders of Nolan and Alexander.

We reiterate that corroborative evidence need not be enough, in and of itself, to support the accused's conviction. Rather, it need only be sufficient to fairly connect the accused with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (quoting Hawkins v. State, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971)). We hold that the evidence adduced at trial from persons other than the Defendant's accomplices was sufficient to corroborate the accomplices' testimony that the Defendant, acting in concert with Ware, committed the first degree premeditated murders of Jeffrin Nolan and Terrance Alexander. Accordingly, the Defendant is entitled to no relief on this basis.

### First Degree Felony Murder

As charged in this case, the crime of first degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). A robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a) (2003).

The proof in this case established that, after shooting and killing Nolan and Alexander, Ware and the Defendant left the Shop with items belonging to Nolan, including cocaine, Nolan's gun, cash, and Nolan's jewelry. These items were gathered in conjunction with the murders, and some of these items later were found by law enforcement officers at the House. Nolan was known to keep cash from cocaine sales on his person and, although Adams testified that she paid Nolan $400 that afternoon, law enforcement found no money on Nolan's person after he was shot. Thus, the proof was sufficient to establish that Nolan was shot in conjunction with his robbery. Alexander also was shot in conjunction with Nolan's robbery. The Defendant's participation in the shootings of Nolan and Alexander was proved and corroborated as set forth above. Accordingly, we hold that the evidence was sufficient to support the Defendant's convictions of the first degree felony murder of Jeffrin Nolan and Terrance Alexander. The Defendant is entitled to no relief on this basis.

### Especially Aggravated Robbery

An especially aggravated robbery is a robbery, defined above, "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2003). As set forth above, the proof in this case established that, in

30

conjunction with shooting and killing Nolan and Alexander, Ware and the Defendant gathered items belonging to Nolan and took them to the House. This proof was corroborated as set forth above and was sufficient to establish that the Defendant participated in the especially aggravated robbery of Nolan. Accordingly, the Defendant is entitled to no relief on this basis.

<u>Criminal Conspiracy to Commit Aggravated Robbery</u>

The Defendant was charged with conspiring with Green and O'Sheene to commit the robbery of Nolan with a firearm. Thus, the Defendant was charged with conspiracy to commit aggravated robbery. <u>See</u> Tenn. Code Ann. § 39-13-402(a)(1) (2003) (defining aggravated robbery as robbery accomplished with a deadly weapon).

Our criminal code provides as follows:

> (a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

> . . . .

> (d) No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proven to have been done by the person or by another with whom the person conspired.

Tenn. Code Ann. § 39-12-103 (2003). "[T]he essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act." <u>State v. Pike</u>, 978 S.W.2d 904, 915 (Tenn. 1998). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise." <u>Randolph v. State</u>, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978).

Beco testified that he overheard the Defendant discussing the robbery and killing of Nolan with O'Sheene and Ware. Gardner testified that she overheard the Defendant discussing the robbery and killing of Nolan with O'Sheene, Beco, Green, and Ware. Green testified that he heard the Defendant talking with Ware and O'Sheene about robbing Nolan. This testimony about the element of agreement was corroborated by the Defendant's participation in the aggravated robbery of Nolan, proved and corroborated as set forth above.

31

Moreover, the Defendant's participation in the aggravated robbery, proved and corroborated as set forth above, established the overt act required to prove a conspiracy.

Accordingly, we hold that the evidence was sufficient to support the Defendant's conviction of criminal conspiracy to commit aggravated robbery and that he is entitled to no relief on this basis.

### Possession of Over 26 Grams of Cocaine for Resale

Our criminal code provides that "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell such controlled substance." Tenn. Code Ann. § 39-17-417(a)(4) (Supp. 2005). Cocaine is a controlled substance. Id. § 39-17-408(a), (b)(4) (2003). Moreover, "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419 (2003). "Criminal liability may result from sole possession or joint possession with another person." State v. Dale Samuel Waggoner, No. M2013-00731-CCA-R3-CD, 2014 WL 1354938, at *4 (Tenn. Crim. App. Apr. 4, 2014) (citing State v. Richards, 286 S.W.3d 873, 885-86 (Tenn. 2009)).

In this case, Special Agent Glenn testified that the cocaine collected by law enforcement officers from the House totaled over 45 grams. We have determined that the proof was sufficient to establish the Defendant's participation in the robbery of Nolan, including the taking of Nolan's cocaine. Adams testified that she delivered four ounces of cocaine to Nolan at about 3:30 on the afternoon of Nolan's murder. When she left, Alexander was in the Shop. Octavia testified that she was prevented from purchasing any cocaine from Nolan immediately prior to Nolan's murder. Law enforcement found no cocaine at the Shop other than a small amount on Alexander's person. This proof permitted the jury to infer that the Defendant participated in the taking of four ounces of cocaine from Nolan. When law enforcement officers found cocaine at the House, it was packaged in a manner indicating that it was for resale. Accordingly, we hold that the proof was sufficient, and was sufficiently corroborated, to support the Defendant's conviction of this offense and that he is entitled to no relief on this basis.

### Maintaining a Dwelling Where Controlled Substances are Used or Sold

Tennessee Code Annotated section 53-11-401 provides that "[i]t is unlawful for any person . . . [k]nowingly to keep or maintain any . . . dwelling . . . that is used for keeping or

selling [controlled substances] in violation of" the law. Tenn. Code Ann. § 53-11-401(a)(5) (2005). This Court has held that, for the State to establish a violation of this statute, it

> must show that the person continuously exercised some authority or control over the property for an appreciable period of time. While proof of residency is a significant factor to consider, that factor alone is not dispositive. Other factors that may be considered include whether the person owned or leased the property; is the only permanent resident in the home; paid any rent, taxes, or utilities; took part in the home's maintenance or upkeep; or provided furnishings for the home.

State v. Laura Starkey, No. M2005-02896-CCA-R3-CD, 2007 WL 1266581, at *5 (Tenn. Crim. App. May 2, 2007), perm. app. denied (Tenn. Aug. 27, 2007) (citations omitted).

We hold that the State failed to adduce sufficient evidence that the Defendant committed this offense. The proof established that Rita and Octavia leased the House on October 26, 2005, and paid the security deposit. Thus, the House had been leased for less than a month at the time the instant crimes were committed. While Green testified that the Defendant initially had a bedroom in the House, Green took over this bedroom. Multiple witnesses, including Stanley, testified that the Defendant lived with Stanley in an apartment, and Green testified that he picked the Defendant up at Stanley's apartment on November 18, 2005, prior to their trip to the Shop. There is no proof that the Defendant contributed money to pay the rent or other expenses, provided furnishings, or participated in the upkeep of the House. There also is no proof that the Defendant "continuously exercised some authority or control over the [House] for an appreciable period of time." Id. Accordingly, because the State failed to adduce sufficient proof to establish this offense, we are constrained to reverse the Defendant's conviction of this offense and dismiss this charge. See State v. Winters, 137 S.W.3d 641, 657 n.5 (Tenn. Crim. App. 2003) (recognizing that "the remedy for a conviction premised upon insufficient evidence is dismissal of the prosecution").

### Criminal Conspiracy to Possess More than 26 Grams of Cocaine with the Intent to Sell or Deliver

The presentment charging the Defendant with this crime alleged the following:

> The Grand Jurors for Sullivan County, Tennessee, being duly empanelled and sworn, upon their oath present that [the Defendant] [and] Thelma Winnifred Gardner, acting in concert and each being a party to the offense with each other, from on or about October 18, 2005 to on or about November 18, 2005, in the State and County aforesaid and before the finding

33

of this presentment, did unlawfully, feloniously, and knowingly agree that one or more of them would engage in conduct which constituted the offense of possession of more than twenty-six (26) gram [sic] of a substance containing Cocaine, a Schedule II Controlled Substance, with the intent to sell or deliver and the said [the Defendant] each intentionally act for the purpose of promoting or facilitating the commission of the said offenses and as a result of the conspiracy, an overt act was committed in furtherance of the conspiracy, to wit: [the Defendant] did maintain a dwelling where they stored more than twenty-six (26) grams of a substance containing Cocaine from which they sold or delivered the said Cocaine contrary to T.C.A. § 39-17-417, a Class B felony, and against the peace and dignity of the State of Tennessee.[15]

(Footnote added). The record is devoid of any proof that the Defendant entered into an agreement with Gardner concerning their possession of more than twenty-six grams of cocaine. As set forth above, there also is no proof that the Defendant "did maintain a dwelling" where he and Gardner stored cocaine, the alleged overt act. Accordingly, we also must reverse this conviction and dismiss this charge.

*Consolidation of Offenses*

The Defendant was charged with the instant crimes in two separate presentments. Presentment number S51,540, returned on December 13, 2005 ("the First Presentment"), charged the Defendant with criminal conspiracy to possess more than 26 grams of cocaine with the intent to sell or deliver, committed "from on or about October 18, 2005 to on or about November 18, 2005"; possession of over 26 grams of cocaine for resale, committed "on or about November 18, 2005"; and maintaining a dwelling where controlled substances are used or sold, committed "on or about November 18, 2005." Presentment number S52,127, returned on May 24, 2006 ("the Second Presentment"), charged the Defendant with four counts of first degree murder, committed "on or about the 18th day of November, 2005"; especially aggravated robbery, committed "on or about the 18th day of November, 2005"; and criminal conspiracy to commit aggravated robbery, committed "on or about the 18th day of November, 2005." Prior to trial, the State requested the trial court to consolidate all of the offenses in the two presentments against the Defendant pursuant to Tennessee Rule of Criminal Procedure 13. In its motion, the State averred the following:

3. The offenses charged in the two presentments could have been joined in a single indictment or presentment pursuant to Rule 8 of the Rules of

---

[15] The copy of the charge included in the record before this Court includes multiple redactions, created with thick black lines. It appears that these black lines cover the names of other persons.

34

Criminal Procedure. *All offenses charged are based on the same conduct or arise from the same criminal episode, and are within the jurisdiction of this Court.* The proceeds of the especially aggravated robbery, which formed the basis of the felony murder counts, include the Cocaine that was seized at the defendant's dwelling pursuant to the execution of a search warrant at his residence. This Cocaine is the basis of the drug charges.

4. The evidence is inextricably intertwined as to both cases and due to this strong bond of connection, the evidence underlying the drug charges would be part and parcel of the State's case on the murder charges.

(Emphasis added). Thus, the State took the position in its motion that the offenses in the two presentments were subject to mandatory joinder because Tennessee Rule of Criminal Procedure 8(a) provides that

Two or more offenses *shall* be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13, if the offenses are:

(A) based on the same conduct or arise from the same criminal episode;

(B) within the jurisdiction of a single court; and

(C) known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s).

Tenn. R. Crim. P. 8(a)(1) (emphasis added).

The Defendant resisted the State's motion, and the trial court held a hearing. Officer Jason Bellamy of the KPD testified for the State that he assisted in the investigation of the Nolan and Alexander homicides. He determined that it was common for Nolan to keep a substantial amount of cocaine in the Shop for sale. However, when law enforcement officers searched the Shop after the homicides, they did not find the expected amount of cocaine. After they developed the House as a location of interest, they executed a search warrant there on November 20, 2005. In the House, law enforcement located "a large quantity of cocaine . . . in a downstairs bedroom." They also found Nolan's gun in the clothes dryer. They determined that the Defendant frequented the House on a regular basis.[16] Further

---

[16] The prosecutor asked, "Did you also determine that [the Defendant], *while not actually residing there at that time* home [sic], frequented that home and was there on a regular basis?" (Emphasis added).

investigation and the cooperation of certain suspects revealed that the persons involved in the murders and robbery at the Shop fled to the House immediately thereafter, where there was a discussion about how to divide the proceeds of the robbery. There also was a discussion about destroying evidence in order to avoid apprehension. Thereafter, several of the suspects, including the Defendant, fled the jurisdiction. The Defendant remained a "fugitive" for approximately four years. On cross-examination, Officer Bellamy clarified that their investigation indicated that the Defendant "may have stayed [at the House] on an occasional basis, but probably did not reside there on a . . . regular basis." Rather, it appeared that the Defendant lived in "another area of Johnson City."

Officer Bellamy did not testify about the date on which their investigation linked the Defendant to the crimes committed at the Shop.

The trial court consolidated the offenses in both presentments on the basis of permissive joinder rather than mandatory joinder, making specific reference to Tennessee Rule of Criminal Procedure 14(b)(1).[17] As set forth in more detail below, consolidated offenses may withstand severance pursuant to Rule 14(b)(1) if the trial court determines that the offenses "are part of a common scheme or plan" and that "the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

In its written order granting the State's motion to consolidate, the trial court stated the following:

"The larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Here, the State's position is that the ultimate goal was to gain possession of the victim's drugs for resale. After considering the proof at the hearing, this Court finds that the State has established that the offenses are part of a larger, continuing plan or conspiracy which was to murder the victim Nolan in case S52,126, who is alleged to have sold drugs, and then rob him of his drugs, which is alleged to have been the 26 grams of cocaine in case S51,538 which is charged to have been in the defendant's possession for sale or delivery.

---

Officer Bellamy responded, "Yes, sir."

[17] Tennessee Rule of Criminal Procedure 14(b)(1) refers to the severance of offenses consolidated "pursuant to Rule 8(b)." Tenn. R. Crim. P. 14(b)(1). Rule 8(b) addresses the permissive consolidation of offenses. See Tenn. R. Crim. P. 8(b).

Next, this Court must consider the question of whether evidence of one offense is relevant to some material issue in the trial of the other offenses, and whether the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

. . . .

Pursuant to Tenn. R. Evid. 404(b) evidence of other crimes may be admissible to show things such as identity, motive, intent, guilty knowledge, absence of mistake or accident, or a common scheme or plan. In this case, the defendant's motive, intent, and a common scheme or plan all appear to be very relevant issues; in addition, this court finds that the evidence of the possession of the drugs in case S51,538 which are alleged to have been the proceeds of the robbery in the robbery/murder case S52,126 is admissible to show the defendant's motive, intent, and a common scheme or plan. In addition, this Court finds that the probative value of that evidence is not outweighed by the danger of its prejudicial effect.

Accordingly, the trial court granted the State's motion to consolidate the offenses contained in the two presentments, albeit on a different basis than that advanced by the State. The Defendant now contends that the trial court's ruling was reversible error.

## Standard of Review

We review a trial court's decision to consolidate offenses for an abuse of discretion. State v. Garrett, 331 S.W.3d 392, 401 (Tenn. 2011). We will conclude that a trial court abused its discretion when it applied incorrect legal standards, reached an illogical conclusion, based its ruling on a clearly erroneous assessment of the evidence, or applied reasoning that causes an injustice to the complaining party. Id. We will also find an abuse of discretion "when the trial court has failed to consider the relevant factors provided by higher courts as guidance for determining an issue." Id. In reviewing a trial court's decision to consolidate offenses, we are mindful that,

[B]ecause the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact

and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.

Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000).

Analysis

Tennessee Rules of Criminal Procedure 8, 13, and 14 govern the consolidation of multiple offenses for a single trial against a single defendant. Rule 13 provides that a trial court "may order consolidation for trial of two or more . . . presentments . . . if the offenses . . . could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 13(a). Rule 8, in turn, provides that offenses *shall* be consolidated under the circumstances set forth above, see Tenn. R. Crim. P. 8(a)(1), or that they *may* be consolidated "if: (1) the offenses constitute parts of a common scheme or plan; *or* (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b) (emphasis added). However, if the defendant resists the State's motion to consolidate offenses under Rule 8(b), "the defendant has the *right* to a severance of the offenses unless the offenses are part of a common scheme or plan *and* the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1) (emphases added).

When a defendant resists the State's effort to consolidate offenses, it becomes the State's burden to adduce evidence establishing that consolidation is proper. State v. Toliver, 117 S.W.3d 216, 228 (Tenn. 2003). The trial court must hold a hearing and must "look at 'the facts and circumstances involved in the various crimes that are charged.'" State v. Hall, 976 S.W.2d 121, app. at 146 (Tenn. 1998) (quoting State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990)). And,

the "primary issue" to be considered . . . is whether evidence of one offense would be admissible in the trial of the other[s] if the . . . offenses remained severed. In its most basic sense, therefore, any question as to whether the offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance."

Spicer, 12 S.W.3d at 445 (citations omitted); but see State v. Dotson, 254 S.W.3d 378, 386 n.5 (Tenn. 2008) (emphasizing that Rule 14(b)(1) "requires only that evidence of 'one' offense, not 'each' offense, be admissible at the trial of the others"). In conjunction with issuing its ruling, the trial court also should issue its findings of fact and conclusions of law. Garrett, 331 S.W.3d at 403.

When a trial court is called upon to decide whether evidence of a defendant's alleged crimes on one occasion may be admitted in conjunction with proving his alleged crimes on another occasion, the provisions of Tennessee Rule of Evidence 404(b) come into play. See Garrett, 331 S.W.3d at 402. Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Our supreme court has recognized that "the rationale behind this general rule of inadmissibility is that the 'admission of other wrongs carries with it the inherent risk of the jury convicting a defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge.'" Garrett, 331 S.W.3d at 402 (quoting Dotson, 254 S.W.3d at 387).

Initially, we note that, although the State's motion to consolidate the offenses in the two presentments relied on the provisions for mandatory joinder, see Tenn. R. Crim. P. 8(a)(1), the State put on no proof that "the appropriate prosecuting official" knew about the Defendant's participation in the crimes committed at the Shop at the time the First Presentment was returned. Likewise, the Defendant put on no proof about this point. Accordingly, contrary to the State's argument in its brief, the State was not entitled to have all of the offenses joined pursuant to the mandatory joinder provisions of Rule 8. See State v. Ronnie Dale Gentry, No. E2005-01133-CCA-R3CD, 2006 WL 891211, at *5 (Tenn. Crim. App. Apr. 4, 2006) (holding that, "because the facts in the record fail to establish that the appropriate prosecuting official knew of all of the charges or that all of the offenses were within the jurisdiction of a single court, Rule 8(a) does not require that these offenses be joined for prosecution").

In this case, the trial court did not consolidate the offenses on the basis of mandatory joinder pursuant to Rule 8(a)(1). Rather, the trial court analyzed the issue pursuant to the provisions of Rule 14(b)(1). As set forth above, Rule 14(b)(1) permits consolidation of offenses only upon the satisfaction of two prerequisites: one, "the offenses are part of a common scheme or plan" and, two, "the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). Thus, before a trial court orders consolidation pursuant to this rule,[18] the trial court must conclude from the evidence presented at the hearing that:

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to some material issue in the trial

---

[18] To be precise, Rule 14(b)(1) does not provide an avenue for seeking consolidation but rather provides the defendant the right to a severance of offenses joined pursuant to Rule 8(b) unless these two prerequisites are met. See Tenn. R. Crim. P. 14(b)(1).

of the other offenses; and (3) the probative value of the evidence of the other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Dotson, 254 S.W.3d at 387 (citing Spicer, 12 S.W.3d at 445; Tenn. R. Evid. 404(b)(3)) (footnote omitted).

As to the first prong requiring that the offenses be part of a common scheme or plan, "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Moore, 6 S.W.3d 235, 240 n.7 (Tenn. 1999). As our supreme court has recognized, there are three types of common schemes or plans: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999).

In this case, the trial court determined that all of the offenses were part of a larger, continuing plan or conspiracy, to wit, "to murder the victim Nolan . . . who is alleged to have sold drugs, and then rob him of his drugs, which is alleged to have been the 26 grams of cocaine [referred to in Count Two of the First Presentment] which is charged to have been in the defendant's possession for sale or delivery." As to offenses alleged to be part of a larger plan, the second category, our supreme court has explained that "[a] larger plan or conspiracy in this context contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004). That is, "[t]he larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[12][c] (5th ed. 2005) ("The unifying concept of crimes admitted under this theory is not their high degree of similarity but the common goal or purpose toward which each crime is directed."). "In such circumstances, the proof sought is of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." State v. Cayle Wayne Harris, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *7 (Tenn. Crim. App. Aug. 23, 2005) (citations omitted). Thus, this Court previously has recognized that "the larger, continuing plan category has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another." State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *6 (Tenn. Crim. App. Nov. 1, 2002) (citing State v. Hall, 976 S.W.2d 121, 146 (Tenn. 1998)), perm. app. denied (Tenn. Mar. 10, 2003). When the State fails to demonstrate a "working plan" whereby the subsequent offenses are predictable or probable from the defendant's determination to commit the initial offenses (or vice versa),

the subsequent offenses cannot be classified as parts of a larger, continuing plan.  See id.

We emphasize that the consolidated offenses each must serve or further the overarching goal or plan that existed at the time the first offenses were committed.  See, e.g., State v. Hall, 976 S.W.2d 121, app. at 146 (Tenn. 1998) (consolidation of multiple murders, burglaries and thefts committed by escapees of Kentucky prison was proper because "the various crimes and the sequence of their occurrence were part of a greater plan to leave the country and to avoid capture by the Kentucky authorities"); State v. William Arthur Shelton, No. E2005-02014-CCA-R3-CD, 2006 WL 3246100, at *4 (Tenn. Crim. App. Nov. 9, 2006) (consolidation of aggravated kidnapping and vandalism offenses with murder offense proper where defendant detained kidnapping victims in house, including vandalizing vehicles to prevent their leaving, in order to lure murder victim there so he could kill murder victim; defendant announced plans to kill murder victim while detaining kidnapping victims; and defendant continued in his efforts to find and kill the murder victim, succeeding the next morning; establishing "a clear example of a larger, continuing plan"), perm. app. denied (Tenn. Mar. 12, 2007); State v. William Ramsey, No. M2001-02735-CCA-R3-CD, 2003 WL 21658589, at *9 (Tenn. Crim. App. July 15, 2003) (consolidation of aggravated robbery and theft offenses proper, even though four months separated the offenses, where "there was substantial evidence that both the theft and vandalism of the vehicle and the aggravated robbery of [the victim] were committed for the same purpose of retaliating against [the victim's husband]"), perm. app. denied (Tenn. Dec. 22, 2003).

In this case, the State's theory was that the Defendant was involved with several other people in an ongoing business of dealing cocaine.  Indeed, the first count of the First Presentment alleged an ongoing month-long conspiracy between the Defendant and Gardner to possess more than 26 grams of cocaine with the intent to sell or deliver.  The overt act alleged in count one of the First Presentment was that the Defendant "did maintain a dwelling where [the Defendant and Gardner] stored more than twenty-six (26) grams of a substance containing Cocaine from which they sold or delivered the said Cocaine."  Count one of the First Presentment contains no allegations connecting the activities described therein with the crimes committed against Nolan and Alexander.  Certainly, persons suspected of being involved in ongoing drug dealing are suspected of obtaining and storing significant quantities of drugs.  Obtaining and storing drugs, however, does not necessarily imply homicide or robbery.  Nor did the State demonstrate at the hearing on the motion to consolidate that the Defendant's alleged month-long conspiracy with Gardner was somehow connected to the crimes against Nolan and Alexander.  Accordingly, we hold that the trial court erred in ordering the consolidation of count one of the First Presentment with the offenses alleged in the Second Presentment.

41

For the same reasons, we hold that the trial court erred in consolidating the third count of the First Presentment with the offenses alleged in the Second Presentment. Count three of the First Presentment, which charged the Defendant with maintaining a dwelling where controlled substances are used or sold, alleged that the Defendant and Gardner, "acting in concert and each being a party to the offense with each other, on or about November 18, 2005, . . . did unlawfully, feloniously, and knowingly keep or maintain a dwelling, building or other structure or place which is used for keeping or selling controlled substances." The State presented no proof at the hearing demonstrating that the Defendant's alleged illegal maintenance of a dwelling was in any way connected with the crimes against Nolan and Alexander.[19] Therefore, the proof did not support the trial court's conclusion that this alleged offense was part of a larger plan that involved the homicide and robbery of Nolan.

We reach a different conclusion with regard to the second count of the First Presentment ("Count Two"). Count Two alleged that the Defendant and Gardner "acting in concert and each being a party to the offense with each other, on or about November 18, 2005, . . . did unlawfully, feloniously, and knowingly [possess][20] with intent to sell or deliver twenty-six (26) grams or more of a substance containing Cocaine." (Footnote added). The State established at the hearing that the cocaine forming the basis of this charge was that taken from Nolan in conjunction with Nolan's homicide and robbery. Thus, there was a sufficient nexus between Count Two and the offenses alleged in the Second Presentment to support the trial court's finding that this offense was part of a larger plan that included the offenses against Nolan.

We turn, then, to the second prong of Rule 14(b)(1), the admissibility of proof about Count Two in the trial of the offenses alleged in the Second Presentment. We agree with the trial court that proof about the Defendant's possession of over 26 grams of cocaine after the crimes at the Shop had been committed was relevant and admissible to establish the Defendant's participation in the first degree murder and robbery of Nolan because it provided a motive for his alleged crimes against Nolan. Proof of other crimes may be admissible under Rule 404(b) when the proof is relevant to an issue other than the defendant's character, such as identity, motive, intent, or absence of mistake. See State v. Gilliland, 22 S.W.3d 266, 271 & n.6 (Tenn. 2000).

---

[19] Indeed, the prosecutor at the hearing indicated his understanding that the Defendant did not even reside at the House.

[20] Count Two does not actually include the word "possess," but the title of the charge, "Possession of over twenty-six grams of cocaine for resale," makes clear the offense being charged. Moreover, the Defendant has raised no issue regarding the verbiage of the two presentments.

Finally, we must review the trial court's conclusion that the probative value of this proof was not outweighed by the danger of unfair prejudice. We agree with the trial court that it was not. As our supreme court has recognized, proof of other crimes is most prejudicial when it is similar to the offense for which the defendant is being tried. See, e.g., State v. James, 81 S.W.3d 751, 762 (Tenn. 2002) (recognizing that a jury's temptation to convict based on a defendant's perceived propensity to commit crimes is increased when the other crimes are similar to the crimes on trial). In this case, Count Two and the crimes alleged in the Second Presentment were not similar. Count Two was a drug possession charge, and the charges in the Second Presentment were murder, robbery, and conspiracy charges. Moreover, proof about the Defendant's commission of Count Two was highly relevant to demonstrate his participation in the crimes alleged in the Second Presentment, and proof of Nolan's robbery was highly relevant to establish the Defendant's identity as one of the possessors of the cocaine found at the House. Our supreme court has recognized that, when proof of other crimes is highly relevant to material issues, does not introduce any extraneous issues, and does not cause the jury to decide the case on an improper basis, the probative value of the challenged proof is not outweighed by its prejudicial impact. See State v. DuBose, 953 S.W.2d 649, 654-55 (Tenn. 1997).

In sum, we have determined that the trial court erred in consolidating counts one and three of the First Presentment with the offenses alleged in the Second Presentment. This Court reviews a trial court's erroneous consolidation of offenses for harmless error as to each of the defendant's ensuing convictions. See Garrett, 331 S.W.3d at 405.

> That is, we must determine whether the trial court's error more probably than not affected the judgment. In making this determination, we consider the whole record and focus on the impact the error may reasonably be taken to have had on the jury's decision-making. Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless.

Id. (internal quotation marks and citations omitted).

We have no difficulty in concluding that the trial court's erroneous order of consolidation as to counts one and three of the First Presentment was harmless in this case. First, we have reversed the Defendant's convictions of the offenses alleged in counts one and three of the First Presentment and dismissed those charges. Accordingly, we have eliminated any prejudice the Defendant may have suffered from the erroneous consolidation with respect to those two convictions. Second, the proof in support of those two counts was slight to non-existent while the proof of the charges alleged in the Second Presentment was overwhelming. Thus, we are confident that the jury would have convicted the Defendant of the offenses

43

alleged in the Second Presentment even absent any proof about the Defendant's alleged commission of the offenses charged in counts one and three of the First Presentment. See Spicer, 12 S.W.3d at 447-48 ("In most severance cases, 'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict.'") (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)).

Thus, the Defendant suffered no prejudice as a result of the trial court's erroneous consolidation of counts one and three of the First Presentment with the Second Presentment. Accordingly, we hold that the Defendant is entitled to no relief on this basis.

*Use of Stun Belt*

In his opening brief, the Defendant contends that he is entitled to a new trial because the State ordered him to wear a "stun belt" without the benefit of a prior hearing before the trial court. The State responds that the Defendant has waived this issue by failing to cite to the record "to show where he requested a hearing on this issue" and by failing to cite "to any evidence to show that [he] actually wore a stun belt during trial." In his reply brief, the Defendant asserts that he "wore a stun belt during his trial as a matter of fact" and refers to the argument on this issue at the motion for new trial. He asks for relief via this Court's discretionary review under plain error.

In Mobley v. State, 397 S.W.3d 70 (Tenn. 2013), our supreme court addressed for the first time the use of a stun belt "as an in-court restraint measure for criminal defendants," id. at 99, and concluded that trial courts should use the principles and procedures applicable to the use of shackles in determining whether a defendant should be required to wear a stun belt during his or her criminal trial. Id. at 101 (citing Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976)). Our high court elucidated:

> To that end, we reiterate that there is a legal presumption against the use of in-court restraints. To justify the use of restraints, the State bears the burden of demonstrating necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during trial. The trial court should consider all relevant circumstances, including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security. The trial court should consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the

44

defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process.

Id. (internal citations omitted).

We have reviewed the hearing on the motion for new trial, and the State stipulated that there was no hearing on the issue of whether the Defendant should wear a stun belt at trial. The prosecutor asserted to the trial court that there was no hearing "because there was never a defense motion filed pertaining to this issue." The trial court asked defense counsel if he objected either before or at the trial to the use of a stun belt, and defense counsel replied, "No." Defense counsel asserted that the lack of a hearing on the issue entitled the Defendant to a new trial. Significantly, the defense elicited no proof at the motion for new trial hearing that the Defendant wore a stun belt during his trial. See State v. Wagner, 382 S.W.3d 289, 299 n.10 (Tenn. 2012) (recognizing that "argument and statements of counsel are not evidence and should be disregarded if not supported by the evidence"). The record does not reflect whether the trial court was aware that the Defendant actually was wearing a stun belt during the trial. The trial court denied the Defendant a new trial.

In order to obtain relief on the basis of plain error, the party seeking relief must satisfy five prerequisites:

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). If any one of these factors is not satisfied, we need not consider the remaining factors. Id. at 283.

In this case, the record simply does not demonstrate that the Defendant actually wore a stun belt during his trial. Defense counsel's assertion in the Defendant's reply brief that the Defendant "wore a stun belt during his trial as a matter of fact" does not constitute evidence cognizable by this Court. See Wagner, 382 S.W.3d at 299 n.10. Accordingly, because the record does not demonstrate clearly what occurred at the trial court, the Defendant has failed to establish that he is entitled to plain error relief on this basis.

45

*Instructions on Accomplices*

The trial court verbally instructed the jury about accomplices as follows:

An accomplice is a person who knowingly, voluntarily, and with common intent with the principals – principal offender, unites with him or her in the commission of the crime.

If a witness was an accomplice in the crime, then her or her testimony – his or her testimony must be corroborated. Corroborating evidence is the evidence, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference not only that the crime has been committed, but also that the Defendant was implicated in it. This independent corroborative testimony must include some fact or circumstance that affects the Defendant's identity.

Corroborative evidence may be direct or entirely circumstantials [sic] and need not be adequate, in and of itself, to support a conviction. It is sufficient if the corroborative evidence fairly and legitimately tends to connect the Defendant with the crime charged. It is a question for the Jury to determine whether an accomplice's testimony has been sufficiently corroborated. Accomplice testimony cannot be corroborated by another accomplice's testimony.

In this case it is a question for the Jury to determine whether the witnesses Brian Beco, Thelma Gardner, and Octavia Brooks were each an accomplice in Case #S52217 [sic].[21] If you find from the proof that the witness was an accomplice, then the Defendant cannot be convicted upon the uncorroborated testimony of this witness.

If you find the witness was not an accomplice, then you will judge the weight to be given to his or her testimony just as you do – do that of other witnesses in the case.

In this case it is a question for the Jury to determine whether the witness Crystal Arnold was an accomplice in either or both cases, Case Numbers S51540, Case Number S52127. If you find from the proof that the witness was

---

[21] Case number S52,127 included the first degree murder, especially aggravated robbery, and conspiracy to commit especially aggravated robbery counts.

46

an accomplice, then the Defendant cannot be convicted upon the uncorroborated testimony of this witness.

If you find that the witness was not an accomplice, then you will judge the weight to be given to her testimony just as you do that of other witnesses in the case.

It is – in this case the Court charges you that the witnesses Brian Beco, Thelma Gardner, and Octavia Brooks were each accomplices in Case #51540,[22] and before – and before the Defendant can be convicted you must find this – that this accomplice testimony has been sufficiently corroborated.

In this case the Court also charges you that Clyde Green was an accomplice in Case #S51540, Case #S52127, and before the Defendant can be convicted you must find that this accomplice testimony was sufficiently corroborated.

The Defendant contends that the trial court should have instructed the jury that Beco, Gardner, and Octavia were accomplices as a matter of law as to the murder, especially aggravated robbery, and conspiracy to commit aggravated robbery charges.

An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." State v. Robinson, 146 S.W.3d 469, 489 (Tenn. 2004) (citing Ripley v. State, 227 S.W.2d 26, 29 (1950); State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). However, when "the facts are disputed or susceptible to different inferences," it is for the jury to determine whether the witness was an accomplice. Id. (citing Perkinson, 867 S.W.2d at 7). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." Id. (citing Monts, 379 S.W.2d at 43).

### Brian Beco

Beco testified that he was outside the Shop during the homicides. However, he maintained that he was there to buy drugs, not to participate in the robbery or killing of Nolan. Certainly, Beco remained at the scene even after he was informed that the others were there to rob Nolan. Moreover, he had heard an earlier conversation in which the others

---

[22] Case number S51,540 included the drug charges.

had discussed both robbing and killing Nolan. However, mere presence at the scene of a crime does not render a person criminally responsible for the crime, even if the person was aware that the crime was going to take place. See Tenn. Code Ann. §§ 39-11-402 (defining criminal responsibility for conduct of another); 39-11-403 (2003) (defining criminal responsibility for facilitation of felony).

We hold that the proof at trial about Beco's presence outside the Shop was susceptible to different inferences and that the proof of his alleged participation in the homicides, robbery, and conspiracy was not clear and undisputed. Accordingly, the trial court did not err in failing to instruct the jury that Beco was an accomplice as a matter of law in the homicides, robbery, and conspiracy to commit the robbery. The Defendant is entitled to no relief on this basis.

## Thelma Gardner

Gardner testified that she overheard a conversation in which the Defendant, O'Sheene, Beco, Green, and Ware discussed robbing and killing Nolan. She also testified that, after the attack at the Shop, she burned Octavia's and Ware's clothing. Thus, Gardner admitted to the destruction of evidence after the crimes were committed, rendering her an accessory after the fact. See Tenn. Code Ann. § 39-11-411(a)(2) (2003); State v. Jonathan Michael Brown, No. E2013-00570-CCA-R3-CD, 2014 WL 890951, at *8-9 (Tenn. Crim. App. Mar. 6, 2014) (proof that defendant assisted in burning victim's purse after assailant killed her was sufficient to support defendant's conviction of accessory after the fact). However, Gardner was not present at the Shop during the commission of the offenses nor is there "clear and undisputed" proof in the record establishing her criminal responsibility for the offenses. Accordingly, the trial court did not err in failing to instruct the jury that Gardner was an accomplice as a matter of law to the crimes committed at the Shop. See Monts, 379 S.W.2d at 43 ("[I]n Tennessee, an accessory after the fact is not subject to indictment for the offense committed by his principal; but rather he is guilty of a separate and distinct offense . . . . Thus under the generally accepted test, an accessory after the fact could not be considered as an accomplice within the rule requiring that the testimony of an accomplice be corroborated."), overruled on other grounds by State v. Collier, 411 S.W.3d 886, 899 (Tenn. 2013). The Defendant is entitled to no relief on this basis.

## Octavia Brooks/Wilson

Octavia testified that she went to the Shop on November 18, 2005, with Beco to buy cocaine from Nolan. Once they arrived, they saw the Lincoln. O'Sheene informed them that they were planning to rob the Shop. O'Sheene told Octavia to go into the Shop first and told her that Ware and the Defendant would follow her. As Arnold testified, Octavia was to act

as the "decoy." Octavia did as she was directed and told Nolan she wanted to buy some cocaine. When Nolan went into the back room of the Shop, the Defendant and Ware, with guns drawn, told her to leave. She left without having gotten the cocaine she was there to purchase. She hurried back to the Lincoln, got in the driver's seat, and tried to turn the car around in preparation for flight. She subsequently pleaded guilty to facilitation to commit the first degree murders of Nolan and Alexander, facilitation to commit especially aggravated robbery, and criminal conspiracy to commit aggravated robbery.

Because Octavia previously had been convicted for charges based on the same facts, the trial court should have instructed the jury that Octavia was an accomplice as a matter of law. See State v. Jimmy Wayne Baker, No. M1999-00454-CCA-R3-CD, 2001 WL 252082, at *7 (Tenn. Crim. App. Mar. 14, 2001), perm. app. denied (Tenn. Sept. 10, 2001). However, the record reflects that, during the discussion about this issue between the trial court and counsel, the trial court asked defense counsel for his position on Octavia. Defense counsel responded, "[p]robably a jury question." Accordingly, the Defendant has waived this issue.

Moreover, we hold that the trial court's error in this regard was harmless because there was sufficient corroborating evidence to establish the Defendant's guilt. See id. As set forth above, Casey identified a photograph of the Defendant as depicting one of the men she saw walking toward the Shop on November 18, 2005, and whom she later saw returning from the Shop. Beco testified that the Defendant told him that he had fired a gun in the Shop and that it had jammed. Capt. Bellamy testified that the police recovered only two shell casings from the Shop. Special Agent Scott testified that, when a gun jams while being fired, it can retain the cartridge casing. Johnson testified that she saw the Defendant in Baltimore, Maryland on November 19, 2005, the day after the homicides. "[F]light and attempts to evade arrest are relevant as circumstances from which, when considered with other the facts and circumstances in evidence, a jury can properly draw an inference of guilt." State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985) (citing Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972)); see also Dorantes, 331 S.W.3d at 388.

We reiterate that corroborative evidence need not be enough, in and of itself, to support the accused's conviction. Rather, it need only be sufficient to fairly connect the accused with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992). We hold that the evidence adduced at trial from persons other than the Defendant's accomplices was sufficient to corroborate the accomplices' testimony that the Defendant participated in the first degree murders of victims Nolan and Alexander, the especially aggravated robbery of Nolan, and the criminal conspiracy to commit the aggravated robbery of Nolan. Accordingly, the Defendant is entitled to no relief on this basis.

49

*Sentencing*

After the jury rendered its verdicts, the trial court imposed sentences of life imprisonment (with the possibility of parole) for the first degree premeditated murder convictions. After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to sixteen years for the especially aggravated robbery conviction; six years for the criminal conspiracy to commit aggravated robbery conviction; ten years for the criminal conspiracy to possess over 26 grams of cocaine for sale or delivery conviction; ten years for the possession of over 26 grams of cocaine for sale or delivery conviction; and three years for the maintaining a dwelling where controlled substances are sold or used conviction. The trial court ordered the sentences to be served in a manner that resulted in an effective term of two consecutive life sentences. The only issue raised by the Defendant in this appeal is the trial court's order that the Defendant serve his two life sentences consecutively.

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (Supp. 2005).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1),

50

(3)(C) (Supp. 2005). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2003).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (Supp. 2005).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This same standard of review applies to a trial court's order of consecutive service. See State v. Pollard, __ S.W.3d __, __, No. M2011-00332-SC-R11-CD, 2013 WL 6732667, at *9 (Tenn. 2013) ("So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal.") (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In this case, the State originally sought the death penalty. However, more than two years prior to trial, the State announced to the trial court its decision to withdraw its intention to seek the death penalty. In response to the trial court's inquiry, the State also withdrew its intention to seek a sentence of life imprisonment without the opportunity for parole. The Defendant now contends that, by forgoing its opportunity to seek a sentence of life imprisonment without parole, the State waived its right to seek consecutive life imprisonment terms, and the trial court erred by imposing consecutive life imprisonment terms. The Defendant argues that, in effect, the trial court imposed a term of life imprisonment without parole, a potential sentence abandoned by the State.

We acknowledge that a trial court may impose the specific sentence of life imprisonment without the possibility of parole only upon a finding, by either the trial court in a bench trial or by the jury in a jury trial, of one or more statutory aggravating factors. See Tenn. Code Ann. § 39-13-204(I) (2003). This statutory limitation on the sentences that may be imposed upon a conviction of first degree murder is not, however, the equivalent of a ban on the imposition of consecutive sentences that result in effectively eliminating the possibility of parole. Rather, when the State does not seek a trial in which the potential punishments may be the death penalty or a sentence of life imprisonment without the possibility of parole, the trial court retains the statutory discretion to order the consecutive service of multiple sentences pursuant to Tennessee Code Annotated section 40-35-115.

Pursuant to this statute, a trial court may order multiple sentences to run consecutively upon a finding that the preponderance of the proof established one or more of the following factors:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

. . . .

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]

Tenn. Code Ann. § 40-35-115(b) (2003).

Thus, if a Range I defendant is convicted of, for instance, a second degree murder, an especially aggravated robbery, and two aggravated rapes, all Class A felonies, he faces terms of up to twenty-five years for each offense. See Tenn. Code Ann. § 40-35-112(a)(1) (2003). Each sentence must be served at 100 percent, less up to 15 percent sentence credits earned. Id. § 40-35-501(i)(1), (i)(2)(B), (i)(2)(E), (i)(2)(F) (2003). If the trial court orders these sentences to be served consecutively, the defendant receives an effective sentence of one hundred years and may not be considered for parole until he has served at least eighty-five years. If the defendant was thirty years old at the time he began serving his sentence, he would be over one hundred years old before becoming eligible for parole. Such a sentence is the equivalent of a sentence of life imprisonment without the possibility of parole and is entirely permissible under our sentencing scheme.

The Defendant has cited us to no authority for the proposition that, by waiving its right to seek a sentence of life imprisonment without the possibility of parole, the State thereby effectively prohibited the trial court from imposing consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115. We hold that the trial court retained the authority to sentence the Defendant to consecutive life terms pursuant to section -115.

In this case, the trial court ordered consecutive service on the basis that the Defendant was a dangerous offender. See id. § 40-35-115(b)(4). The trial court found that the Defendant's criminal behavior indicated little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life is high. The trial court also found that the effective term was reasonably related to the severity of the offenses and was necessary in order to protect the public from further criminal acts by the Defendant. See Pollard, __ S.W.3d at __, 2013 WL 6732667, at *11. The Defendant does not challenge the trial court's determination that he was a dangerous offender subject to consecutive service

53

pursuant to section 40-35 -115(b)(4). Accordingly, the Defendant has waived any contention that the trial court erred in imposing consecutive service on the basis of finding him to be a dangerous offender. Therefore, we affirm the Defendant's sentences.

## CONCLUSION

Because the State failed to adduce sufficient evidence to support the Defendant's convictions of (1) criminal conspiracy to possess more than 26 grams of cocaine with the intent to sell or deliver and (2) maintaining a dwelling where controlled substances are used or sold, we must reverse those convictions and dismiss those charges. We affirm the trial court's remaining judgments.


_____
JEFFREY S. BIVINS, SP. JUDGE